JAMES P. NEWELL, Administrator *Pendente Lite* of Estate of Richard C. Kerens, et al., Appellants, v. WAGNER ELECTRIC MANUFACTURING COMPANY ET AL.—4 S. W. (2d) 1072.

Court en Banc, February 4, 1928.

*Leahy, Saunders & Walther* for appellants.

1034

*Lewis & Rice* and *Rassieur & Goodwin* for respondents.

1036

SEDDON, C.—This is a suit in equity, commenced on November 18, 1922, in which plaintiffs, who are stockholders of the Wagner Electric Manufacturing Company, a Missouri corporation, seek the appointment of a receiver for said corporation, together with other purely equitable relief, upon the ground that a transfer, sale and conveyance, made by the Missouri corporation on August 11, 1922, of all of its properties and assets to the Wagner Electric Corporation, a Delaware corporation, was *ultra vires* and void, violative of a certain statute or law of this State, and a palpable evasion and circumvention of Article 12, Section 10, of the Missouri Constitution. Defendants, other than the Wagner Electric Manufacturing Company, are the officers and directors, respectively, of the said Missouri corporation and of the said Delaware corporation.

The pleadings are of unusual length and contain much detail matter, not necessary to be stated herein. The petition, or bill in equity, charges, in substance, that during the years 1918 to 1921, inclusive, the assets of the defendant Missouri corporation greatly exceeded its liabilities; that early in 1920, anticipating a deflation in the value of inventory and a general, disturbed financial condition, making difficult the borrowing of money at banks, the defendant Missouri corporation made several efforts, through certain investment brokers, to arrange for the sale of a contemplated issue of preferred stock of defendant corporation, but the efforts to arrange the financial condition of the defendant corporation so as to be in a position to meet any sudden deflation in its inventory, or business disturbances generally, met with failure; that, in the year 1921, certain banks and trust companies of St. Louis and New York, to whom defendant corporation owed money, placed on the board of directors of defendant corporation certain persons who represented said banks; that, while said banks were in control of the defendant corporation, the inventory of the defendant corporation was steadily reduced and the moneys derived from the

sale of its products were applied to the payment of the debts of the corporation due to said banks; that, during the entire period that the representatives of the banks were in control of the board of directors of defendant corporation, the corporation was operated at a loss, until March, 1922, when defendant corporation showed an operating profit of more than $40,000, whereupon said banks demanded payment of the moneys due them; that said operating profit continued during the succeeding months to the date of filing of the petition; that the directors of defendant corporation conspired illegally with the representatives of said creditor banks to transfer the assets of the defendant corporation to a corporation to be organized under the laws of Delaware, and, pursuant to such conspiracy, the said transfer was made, without consideration, to the Delaware corporation so organized; that the directors of defendant corporation called a meeting of its stockholders to be held on December 29, 1922, for the purpose of voting on a plan to reduce the capital stock of defendant corporation to a nominal sum, hoping thereby to have the stockholders, or 'a majority of them, ratify the illegal act of the directors in transferring the assets of defendant corporation to said Delaware corporation; that said directors did not have the interest of defendant corporation in mind and were not interested in seeing it carry on and prosecute its business, but that they were interested only in the banks whose interests they represented; that, pursuant to such illegal plan, and in order to benefit said banks, the said directors arranged through Smith, Moore & Company, investment brokers, to refinance defendant corporation; that, under the refinancing plan so arranged, a mortgage for $2,500,000 was placed on the properties of defendant corporation and the assets of defendant corporation were transferred without consideration to the Delaware corporation, which had an authorized preferred stock issue of $3,000,000, of which $1,500,000 was to be sold by said brokers, and which also had an issue of 80,000 shares of nonpar common stock, 20,000 shares of which common stock said brokers were to receive as a bonus; that, in addition thereto, said brokers were to receive a discount of seven per cent on the $2,500,000 bond issue and a like discount on the preferred stock issue; that said transfer was made without warrant of law, without the approval of plaintiffs, and against the interest of defendant corporation, and while defendant corporation had assets of approximately $5,500,000 in excess of its liabilities; that certain officers of defendant corporation were also directors of said creditor banks and were also personally indebted to said creditor banks, whereby they were forced and compelled by said banks to accept said plan of refinancing, or reorganization, although they knew said plan was illegal and not in the interest of defendant corporation and its stockholders; that certain officers of defendant corporation disposed of their corporate stock before voting to adopt

said plan; that, as an incident to said plan, it was agreed that defendant corporation should call a meeting of its stockholders and that a vote should be taken to dissolve the defendant Missouri corporation, in order to deprive it of its assets and prevent it from carrying on its business; that the officers and directors of defendant corporation, also named as defendants herein, although advised by plaintiffs of the illegality of their acts, persisted in acting as above stated, and asserted that, no matter what action was taken by plaintiffs, the plan of Smith, Moore & Company would be carried out if ninety per cent of the stockholders voted in favor of said plan, and that further protests would be useless; that said officers and directors will take no steps to remedy the matters complained of and that a demand upon them to do so would be useless. The equitable relief prayed for in the petition is "that the court immediately issue an injunction restraining the present directors of the said defendant company from holding the meeting aforesaid on the 29th day of December or thereafter, and that they be restrained from holding a meeting to reduce the capital stock of the said defendant company, and that they be restrained from transferring any of the assets of the said defendant company to the said Delaware corporation; that an order be issued to the officers of the said defendant company to appear at this court, at the court's earliest convenience, then and there to show cause why a receiver should not be appointed for the said defendant company for the purpose to immediately institute suit for the purpose of recovering from the said Delaware corporation or whomsoever else to whom the said assets of the said defendant company may have been transferred by the directors of the said defendant company, and to institute suit against the officers and directors of the said defendant company for the damage done to the said defendant company by their misconduct in office; and to sue the officers and directors of the said defendant company for an accounting; and plaintiffs further pray that the officers and directors of the said defendant company be removed and that different stockholders, interested in the said continuance of said defendant company, be appointed to act for said defendant company, and that the receiver, when appointed, be directed to take necessary action to forthwith have the license to do business of the said Delaware corporation, which bears a name almost identical with the said defendant company, canceled by the Secretary of State, and the plaintiffs pray the court to direct the said receiver to institute suits for accounting against the officers and directors who were in charge of the affairs of the said defendant company during the time, as aforesaid, and that the court should direct the said receiver to do all else that may be necessary for the preservation of the property and the carrying on of the business of the said defend-

ant company and the recovery of its assets, and for such other and further orders as to the court may seem proper."

Isaac M. Greer, a stockholder of defendant Missouri corporation, was allowed to intervene as a party plaintiff. In his intervening petition, or bill, he adopts the averments of the original petition and joins in the prayer thereof for equitable relief. He further avers that he had protested, in writing and orally, against the plan of reorganization, and that he had been informed by the officers of defendant Missouri corporation that any protests he might make, or any action he might take, would be unavailing for the reason that the officers of defendant corporation had committed themselves to the plan in question and that they had secured the consent of about ninety per cent of the stockholders to such plan and, consequently, it was useless for him to protest further against the proposed plan.

An order to show cause was entered by the trial court, together with a restraining order, and in due time the defendants filed their return to the order to show cause. The return pleads in detail the financial status of defendant Missouri corporation, its financial difficulties and the various attempts made by its officers, directors, and stockholders to remedy such difficulties, the various steps leading up to the adoption or acceptance of the Smith, Moore & Company proposal, or plan, of refinancing, and the consummation of said plan by vote of approximately 92 per cent of the stockholders of the Missouri corporation at a stockholders' meeting duly called and held on August 4, 1922. resulting in the transfer, sale and conveyance of all the assets of the Missouri corporation to the Wagner Electric Corporation, the Delaware corporation, on August 11, 1922. The return also pleads that "no objection having been interposed by any of the plaintiffs after the date of said meeting (of stockholders on August 4, 1922), the defendant company and the Delaware company and Smith, Moore & Company, on August 11, 1922, consummated the transaction and on that day all of the property of the defendant company was conveyed to the Delaware company and the bonds were issued by the defendant company and delivered to the purchasers and the company received the full consideration of $2,500,000 therefor, and the said bonds have since, and long prior to the bringing of this suit, passed into the hands of bona-fide purchasers and are still so held by them, and the preferred stock was issued by the Delaware company and delivered to the purchasers and the company received the full consideration of $1,500,000 therefor, and the said preferred stock has since, and long prior to the bringing of this suit, passed into the hands of bona-fide purchasers and is still so held by them . . . and defendants state that plaintiffs are estopped by their own laches from now questioning the validity of the sale and transfer of the assets to the new company. . . . Defendants further state that the appointment of a receiver for the de-

fendant company would cause irreparable loss to the new company, the Wagner Electric Corporation, and to all the stockholders thereof." The return further alleges that the plaintiff, James P. Newell, suing as administrator *pendente lite* of the estate of Richard C. Kerens, deceased, long prior to the bringing of this suit, "ceased to be administrator *pendente lite* of said estate and could not bring, and cannot now maintain, this action on behalf of said estate, and neither the said Newell nor his co-plaintiffs are entitled to any relief in this suit." The prayer of the return is that the restraining order theretofore entered be set aside and for naught held; that the temporary injunction prayed and the appointment of a receiver be denied, and that defendants be discharged with their costs.

The reply accepts the admissions of the return and denies generally the new matter therein; avers that the reorganization was an illegal and *ultra vires* scheme to submit to the issuance of preferred stock, and is in contravention and violation of Section 10, Article 12, of the Constitution of this State, which provides, in effect, that no preferred stock of a domestic corporation can be issued except with the unanimous consent of all of its stockholders, and is in violation of the statutes and public policy of the State; reiterates certain allegations of the petition; charges that the commission, or compensation, paid to the brokers, and their syndicates, was enormous, unreasonable and not in the interests of the stockholders of the defendant Missouri corporation; that the effect of said scheme was to strip defendant Missouri corporation of all of its assets and to make its stock worthless; invokes the benefit and protection of Sections 15, 20 and 30, of Article 2, of the Missouri Constitution, and Section 10, Article 1, and the Fourteenth Amendment, of the Federal Constitution; charges that the proposed scheme was attempted upon the basis of the Laws of Missouri of 1921, page 264 et seq., with reference to the dissolution of domestic corporations, and was an illegal and *ultra vires* attempt to invoke the arbitrary power of ninety per cent of the stockholders of defendant corporation in order to consummate the proposed scheme; that the said $2,500,000 issue of mortgage bonds and $1,500,000 issue of preferred stock are still held by the creditor banks under a contract with Smith, Moore & Company; that the defendant Missouri corporation had no right to receive 58,277.7 shares of no-par common stock of the Delaware corporation, and that such holding by the defendant Missouri corporation is *ultra vires* and beyond its corporate powers; and that the defendant corporation was doing a profitable business, had over $5,000,000 of assets in excess of its liabilities, and, in addition thereto, had a good will, resulting from over thirty years of successful business operation, which was worth a large sum of money, and which was not carried as an asset upon its books.

On December 8, 1922, it was agreed by the parties that the cause be tried upon the merits, that the return of the defendants be treated as an answer to the petition and filed as such, and that the reply be treated as a reply to the answer.

The record in the cause is voluminous and is encumbered with a mass of intricate figures and various audits, or accountings, made by public accountants and industrial engineers. Notwithstanding the unusual length and intricacy of the record, the salient facts, as disclosed by the evidence, are not seriously controverted, and we will endeavor to state them herein within as limited bounds as the enormity of the record and a fair statement of the facts will permit.

Defendant, Wagner Electric Manufacturing Company, evolved from a co-partnership and was incoporated under the laws of this State in 1891 and had been in existence, as a corporation, for about thirty years, starting its existence with a capital stock of $25,000. As the business activities of the corporation expanded, the capital stock of the corporation was increased, from time to time, until its capital stock, in the year 1922, amounted to the sum of approximately $6,000,000, represented by 58,277.7 outstanding shares of common stock, having a par value of $100 each. On August 4, 1922, according to the stock book of the corporation, there were 971 individual stockholders. Plaintiff, John S. Leahy, and his co-plaintiffs (other than Isaac M. Greer and Newell, administrator of the Kerens estate) are the holders of 800 shares of the common stock of the corporation. Isaac M. Greer is the holder of 118 shares and the Kerens estate is the holder of 780 shares. The corporation was engaged primarily in the manufacture of electrical products and appliances, and, during the late World War, was engaged in the manufacture of munitions of war. Its president, Mr. W. A. Layman, became connected with the corporation in 1892 as a draftsman, and continued in various executive capacities with the corporation, being elected to the office of president of the corporation in the year 1913. The corporation prospered and built up a large trade and a high reputation for the quality of its products. In 1915, its net earnings were $610,475; in 1916, $1,348,930; in 1917, $615,317; in 1918, $503,719; and in 1919, $549,992.

In 1920, however, the corporation began to feel the after-effect of the war period upon trade conditions. Manufacturing plants were then resuming, or attempting to resume, their pre-war status and were actively and energetically competing for trade. In the latter part of 1919 and the early part of 1920, there was a sharp and rapid revival of business, and the defendant corporation was confronted with the necessity of rapidly building up its stock of raw materials and plant equipment to take care of an anticipated large volume of business. The corporation was then operating on a basis of prospective incoming business of approximately $15,000,000 per

year. In order to take care of this prospective incoming business, the corporation found it necessary to build up its inventory, or stock, of raw materials and supplies, and to enlarge its plant machinery and equipment. Consequently, it increased its inventory stock to a maximum value of $6,800,000 and made arrangements for the expenditure of approximately $1,000,000 for the expansion of its plant equipment. In order to care for this cost of expansion, the corporation was compelled to borrow money. Unsuccessful efforts were made, through investment brokers, to sell a contemplated issue of preferred stock in the sum of $3,500,000, and such efforts proving ineffective of accomplishment, between April 15 and June 15, 1920, approximately $2,000,000 of an issue of common stock was sold at par and the proceeds placed in the working funds of the corporation.

In January and February, 1920, railroad transportation was curtailed, because of heavy snows and abnormal weather conditions, and this was immediately followed by strikes of railroad employees, as a consequence of which, the railroads placed embargoes on freight shipments, with the result that the corporation failed to accomplish its production program and was approximately one-third short of its program as the middle of the year 1920 approached. Therefore, beginning with the month of May, 1920, the corporation, in an effort at curtailment, sought to cancel its orders for raw materials and equipment, and, during the ensuing three or four months, succeeded in canceling approximately $2,500,000 of such orders, but the remaining commitments (principally for equipment) had to be met. In March and April, 1920, the banking situation became more difficult, and note brokers, who had previously disposed of the corporation's notes and evidences of indebtedness, were no longer able to dispose of the same; consequently, the corporation, as its notes in the hands of brokers matured, was compelled to go to its creditor banks for additional credits in order to pay off its maturing obligations, which resulted in the transfer, from brokers to the creditor banks, of about $1,200,000 of the corporation's obligations between March 31 and October 1, 1920.

In October, 1920, a corporation note was maturing at one of the creditor banks and there was some question as to whether that loan would be renewed by the bank. Mr. Layman, president of the corporation, then presented to that bank, and also to all the St. Louis creditor banks, the corporation financial statement of September 30, 1920, which statement showed fixed assets (real estate, buildings, equipment, patterns, patents and designs) of $5,675,593; current, or quick, assets (including cash and Liberty Bonds, amounting to $696,986, and balance in notes and accounts receivable, and inventory) of $9,803,501, and current liabilities, or indebtedness, of

$6,773,418, a ratio of quick assets to current indebtedness of 1.46 to 1. The St. Louis creditor banks became apprehensive, for it seemed apparent to them (the bankers so testified) that, if the quick assets were applied to payment of current indebtedness, the corporation would not have sufficient working capital with which to operate, and the fixed assets (real estate, buildings and equipment) would lie idle because of insufficient capital to operate the business. There was some testimony adduced to the effect that it was the then prevailing rule, or practice, of the Federal Reserve banks not to discount commercial paper unless the ratio of the maker's quick assets to current indebtedness is at least 2 to 1.

A meeting of representatives of the St. Louis creditor banks to consider the financial status of the corporation was held in November, 1920, and subsequently a meeting was held on December 12, 1920, in New York, which was attended by Mr. Layman, representing the corporation, and representatives of all the creditor banks. The corporation then owed $5,115,000 to the creditor banks, seven in all, four being St. Louis banks and three being New York banks. The indebtedness of the corporation to the four St. Louis banks then aggregated $2,715,000, and its indebtedness to the three New York banks then aggregated $2,400,000. At that time, according to Mr. Layman's testimony: "We were getting into a condition where our merchandise creditors were getting restless; our own collections were frozen; business was at a standstill, and we were slowing down in our payments to merchandise creditors, and it was the possibility that we might be sued by some of these merchandise creditors that led to the program of protecting us against that contingency." On November 30, 1920, the corporation, in addition to the banking indebtedness, owed merchandise creditors and other miscellaneous obligations, including pay rolls, taxes, etc., the sum of $1,303,957.

At the New York meeting, a bankers' committee of three were appointed to look after the interests of the banks, and a Bankers' Agreement (so-called) was entered into, in writing, between the defendant corporation, the bankers' committee of three, and the seven creditor banks, on December 15, 1922. The substance of this written Bankers' Agreement was that each of the seven creditor banks agreed to advance the corporation up to twenty per cent of the amount of the corporation paper then held by each creditor bank, an aggregate sum of approximately $1,000,000. Each bank also agreed to extend or renew the corporation's several notes for ninety days from March 20, 1921, upon request of the corporation and with the approval of a majority in number and amount of the said creditor banks. It was also tacitly understood (although apparently not put in writing) that the corporation would increase its board of directors from seven to eleven members, and that the stockholders of the corporation would

elect four representatives of the creditor banks to the board. This understanding was carried out, and, at a meeting of the stockholders of the corporation held on January 10, 1921, the board of directors was increased in number to eleven and four representatives of the creditor banks were elected as members of the board. At a later date, resignations or vacancies upon the board having occurred, two additional representatives of the creditor banks were elected to fill such vacancies on the board, thereby giving the creditor banks a representation of six of the eleven members of the board.

Pursuant to the Bankers' Agreement of December 15, 1920, the creditor banks, on or about January 15, 1921, advanced, or loaned, to the corporation the sum of $500,000, so that on January 15, 1921, the maximum indebtedness of the corporation to the creditor banks was $6,050,000. Mr. Layman testified: "We did not call for any money until the middle of January, and then instead of taking the million we took one-half of a million, because we found when it was known that the banks were standing behind us, not going to force the collection of their accounts, then our merchandise creditors became less restless, and we found out we did not need the million dollars, and we only took half of it; and we actually found later that we did not need that; we could have gotten along without it."

During the year 1921, the corporation reduced its total obligations to all creditors from $7,139,000 to $4,219,000, or a total reduction in obligations of $2,920,000. This was accomplished through a program of retrenchment, including the cutting of salaries of all employees, from the president down through the line of employees; a vigorous collection of accounts receivable; and the manufacture of its raw materials into finished products, coupled with a vigorous sales effort. During that period, the banks were paid approximately forty per cent, and the merchandise and other creditors were paid approximately ninety per cent, upon the corporation indebtedness to those respective creditors. However, after December 31, 1919, no provision, or reserve, was made or put aside for depreciation of plants and equipment.

Notwithstanding economies in operation and salary reductions, the corporation suffered an operating loss in 1921, and on December 31, 1921, the net surplus of the corporation in 1920 had been converted (through shrinkage in values and other losses) into a net deficit of $1,122,579. The net result was that, while the corporation financial statement of September 30, 1920 (about which time the financial situation was first discussed with the St. Louis creditor banks) showed a net surplus of $1,498,959, the corporation financial statement of February 28, 1922, disclosed a net deficit of $1,184,722, or a total shrinkage during the seventeen-month period of approximately $2,683,000.

At the meeting with the representatives of the creditor banks in New York in December, 1920, the creditor banks insisted that the corporation must take active steps toward the liquidation of its bank indebtedness and must work out some plan for placing the corporation on a substantial financial basis. When the several obligations of the corporations to the creditor banks fell due on March 20, 1921, they were extended by the banks for a period of ninety days, according to the Bankers' Agreement, and thereafter, from time to time, such obligations were extended for ninety day periods until they were subsequently paid out of the proceeds of the Smith, Moore & Company plan, hereafter referred to. At, or prior to, each renewal period, however, the creditor banks became more insistent in their demands that the corporation must be refinanced and that the indebtedness to the creditor banks be paid. An officer of one of the St. Louis banks proposed to Mr. Layman, president of defendant corporation, that he would lend his efforts in recommending to the creditor banks the charging off or canceling of ten per cent of the corporation indebtedness to the creditor banks, provided the stockholders of the corporation would raise $1,500,000 additional capital. He talked to several of the larger stockholders respecting his proposal, but they were discouraged and disheartened, and were apparently not willing to raise the required amount, and the proposal was abandoned. Efforts were made by the corporation with different investment brokers to raise moneys upon a proposed bond issue. However, the creditor banks insisted that if a bond issue were placed as an encumbrance upon the physical properties of the corporation, enough money must be provided to pay off the creditor banks in full, which would have left the corporation without sufficient working capital to carry on its business. In April, 1921, the corporation board of directors appointed a special committee, denominated in the record as a "selling committee," to effect a sale of part, or all, of the properties of the corporation, if that proved to be expedient. This "selling committee" conferred with several large competitors of the corporation in an effort to obtain offers for all, or a part, of the properties of the corporation, but no reasonable or acceptable offers were made by these competitors. Finally, at a meeting of the board on July 27, 1921, a member of the board expressed the belief that there was "a current impression that the property of the company was being hawked about," which was likely to prove very harmful to its business, whereupon the board adopted a resolution that "the property of the company is not for sale," and all negotiations for the sale of its properties were withdrawn.

On October 20, 1921, a number of the larger stockholders of the corporation met to discuss ways and means for refinancing the corporation, and then appointed a committee of five, referred to in the record as the "Stockholders' Committee." The Stockholders' Com-

mittee, or individual members thereof, at different times took up the matter of refinancing the corporation with some six or more investment brokers, or banking houses. While most, if not all, of these brokers, or banking houses, indicated their willingness to "float," or dispose of, a bond issue of approximately $2,500,000 (an amount insufficient to pay the loans of the creditor banks in full), yet they would not give any positive assurances that they would render aid in furnishing additional capital to pay off the indebtedness to the creditor banks and to enable the corporation to continue its operations. Other proposals made by brokers were coupled with a payment by the corporation of (what the Stockholders' Committee deemed) an unreasonably high, or excessive, commission, and were rejected by the board of directors, because such proposals were considered to be unfair to the corporation stockholders. Consequently, nothing resulted from these combined efforts on the part of the Stockholders' Committee and the board of directors. Efforts also were made by certain of the stockholders to induce other large stockholders to put in additional capital, which efforts also failed of accomplishment.

In April, 1922, negotiations commenced between Smith, Moore & Company, investment brokers, and the chairman of the corporation Stockholders' Committee, respecting a plan for refinancing the corporation. Smith, Moore & Company estimated that the corporation needed approximately $4,000,000 in order to pay its debts and continue to operate, for it was evident to them that the corporation could not sell its quick assets and pay its debts and thereafter operate with only plant and machinery and without working capital. The quick assets of the corporation on April 30, 1922, amounted to $4,368,077, and its current debts aggregated $4,065,335, of which latter sum approximately $3,750,000 was due to the creditor banks. The ratio of quick assets to current debts was then 1.07 to 1.

The preliminary negotiations resulted in a written proposal from Smith, Moore & Company to the Stockholders' Committee, dated May 29, 1922, substantially as follows:

(a) To purchase from the corporation an issue of $2,500,000 seven per cent first mortgage serial bonds, to be paid off and retired, serially, in certain annual installments, beginning with the year 1926 and ending with the year 1937, as a consideration for which purchase Smith, Moore & Company, and the members of their underwriting syndicate, shall receive a commission of $7\frac{1}{2}$ per cent of the principal of said bond issue.

(b) To purchase $1,500,000 of an issue of preferred stock at par, on condition that the corporation legally authorize such issue of preferred stock and the corporation be organized with a common capital stock of 80,000 shares without par value, or a new corpora-

tion be organized to carry out such purposes, in consideration for which purchase Smith, Moore & Company, and the members of their underwriting syndicate, shall receive 20,000 shares of such no-par-value common stock, with the proviso, however, that the stockholders of the Wagner Electric Manufacturing Company shall be permitted to subscribe for and purchase their pro rata share of said preferred stock at par, receiving as a bonus therefor two-thirds of a share of common stock with every share of preferred stock purchased by them. If the stockholders shall purchase their allotted quota of preferred stock, the underwriting syndicate would then have left 10,000 shares of no-par common stock as compensation for their services and risk in disposing of the issue of preferred stock.

On May 29, 1922, the written proposal of Smith, Moore & Company was presented to the board of directors of the corporation, discussed at such meeting, a few changes in dates and detail made therein, and a resolution adopted by the board to the effect that the proposal, with the changes agreed upon at said meeting, be accepted and recommended by the board to the stockholders of the corporation for their approval. On May 31, 1922, a written contract, or agreement, was entered into and signed by Mr. Layman, as president, on behalf of the corporation, and by Smith, Moore & Company, binding the respective parties to the terms of the plan substantially as outlined in the written proposal of Smith, Moore & Company of May 29, 1922. The written contract contains these paragraphs or special provisions:

"21. It is understood that, if any litigation is instituted against the Wagner Company or its officers or stockholders which, in the opinion of the counsel of Smith, Moore & Company, renders it unwise to proceed with said plan, Smith, Moore & Company may withdraw, for themselves and their associates, from the obligations of this agreement, provided said Smith, Moore & Company give notice in writing to the Wagner Company of such withdrawal within twenty days after the institution of such litigation. . . .

"27. It is distinctly understood that the obligation of Smith, Moore & Company hereunder and their associate underwriters relative to said stock and bonds is in any event dependent upon ninety per cent of the outstanding capital stock of the Wagner Company being voted in favor of the issue of bonds and stocks, as herein provided to be issued either by the Wagner Company or by the new company, and said vote and proceedings being approved by counsel for Smith, Moore & Company."

On May 31, 1922, a letter was sent out by the corporation to its stockholders, outlining the proposed financial plan, as follows:

"It is proposed—

"(a) To authorize seven per cent cumulative preferred stock to the amount of $3,000,000, of which total issue one-half, or $1,500,000, is now to be sold.

"(b) To authorize and sell bonds, bearing interest at a rate not to exceed seven per cent, to the amount of $2,500,000.

"(c) To authorize no-par-value common shares to the amount of 80,000 shares, of which approximately 58,270 are to be exchanged, share for share, with the holders of present common stock; 20,000 shares to be used to accomplish the reorganization and refinancing of the company, and the balance to remain in the treasury for future use.

"It is possible that the plan outlined will have to be carried out by a new corporation to be organized under the laws of Delaware, or some other state to be selected, and to which new corporation may be transferred the assets and business of this company, but such an arrangement will have no material effect on the plan, but will simply involve the exchange of the present stock and acceptance of stock of such new company upon the same basis and with the same relative interest to stockholders as if the plan should be followed by the present organization."

This letter also embodied therein a balance sheet, as of April 30, 1922, showing the financial condition of the corporation at that date, after giving effect to the proposed plan of refinancing, as follows: Capital assets (property, plant, and equipment, $5,832,600, less reserve for depreciation, $1,500,000), $4,332,600; current or liquid assets, $4,429,048; current liabilities, $366,710. Enclosed with the letter was a proxy to be signed by the stockholder, authorizing the persons named therein to take the necessary steps, as outlined in the proxy, to carry out the financing explained in the letter through the present company or through a new corporation; there also was enclosed a subscription blank for the new, or proposed, preferred stock. The letter was accompanied by a circular letter of the same date, signed by the members of the Stockholders' Committee, commending the proposed plan.

On June 10, 1922, another letter was sent out by the Stockholders' Committee to the stockholders of the corporation, again commending the Smith-Moore plan, setting out the several efforts made by the committee toward refinancing the corporation, and urging the stockholders to send in their proxies, irrespective of whether they desired to subscribe for and purchase their pro rata quota of preferred stock.

A meeting of the stockholders of the corporation was called for August 4, 1922, at the principal office of the corporation in St. Louis, Missouri, and a notice thereof duly published and given to the stockholders, the first publication of said notice being made on June 1, and the last publication on August 3, 1922. The notice stated the

purposes of the meeting and the several propositions to be submitted and voted upon.

Meanwhile, plaintiff, John S. Leahy, and intervener, Isaac M. Greer, by letter and orally, voiced their opposition to the Smith, Moore & Company plan, both having received the letters, outlining and commending the plan, sent out by the corporation and the Stockholders' Committee on May 31 and June 10, 1922. Both Mr. Leahy and Mr. Greer expressed to certain officers of the corporation, in no uncertain language, their belief that the proposed plan was unnecessarily costly to the stockholders; that the commission and stock bonus to be paid to the brokers and their syndicates were excessive and unreasonable; that the corporation could be placed on a substantial financial basis by the sale of an issue of bonds, the sale of additional common stock, and the making of new banking connections; that the corporation was solvent and had made a profit for the preceding several months; and that, insofar as the proposed plan involved the incorporation of a new company under the laws of Delaware and the transfer, by the Missouri corporation to the new corporation, of all its assets and business in consideration of the common stock of the new corporation, the plan was entirely illegal and unauthorized in law. Mr. Leahy made some efforts to refinance the corporation. In June, 1922 (according to Mr. Leahy's testimony), he sought to interest a large insurance company in loaning, through the medium of a bond issue, two and one-half or three million dollars to the corporation, to be secured by first mortgage on its fixed assets, and Mr. Leahy and a representative of the insurance company made an inspection of the corporation's plant. There is some divergence in the testimony respecting this subject, Mr. Leahy testifying that Mr. Layman told him at the time that the directors of the corporation were already committed to the Smith, Moore & Company plan and that any other proposal would be useless, while Mr. Layman testified that he thought the inspection of the plant by Mr. Leahy and the insurance company's representative was made before the approval of the Smith, Moore & Company plan, and that the insurance company's representative was asked to make an offer, or proposal, of a net sum (after deducting all commissions) to the corporation, which the insurance company never did. Mr. Leahy also sought to interest a New York bank and certain other investors in coming to the financial aid of the corporation. When approached by another stockholder of the corporation with a plan to sell an issue of preferred stock of the corporation, without bonus, to the stockholders, Mr. Leahy stated that he personally would take $25,000 of such preferred stock. None of Mr. Leahy's attempts or efforts to aid in refinancing the corporation, however, resulted in any definite proposal or plan being made to the corporation.

In short, prior to the meeting of the stockholders of the corporation on August 4, 1922, apparently no acceptable or tangible proposal for refinancing the corporation, other than the Smith-Moore plan, had been presented to the corporation. The stockholders' meeting was convened and held on August 4, 1922, pursuant to the published call. None of the plaintiffs herein appeared at that meeting, in person or by proxy, and none of their stock was voted, except the stock of the Kerens estate, which was voted in favor of the Smith-Moore plan upon the signed proxy of Newell, administrator of said estate. There were present and represented at that meeting, in person or by proxy, stockholders owning 53,597 shares of the outstanding 58,277.7 shares of stock of the corporation. Two resolutions or propositions were submitted and voted upon by the stockholders: (1) to authorize the bond issue of $2,500,000 by the corporation; (2) to authorize the sale, transfer and delivery of the property and assets of the corporation to the new Delaware corporation, in consideration of 58,277.7 shares of no-par-value common stock of the Delaware corporation and the assumption by the Delaware corporation of the debts and liabilities (including bonded indebtedness) of the Missouri corporation. 53,546 shares of the capital stock of the corporation were voted in favor of, and 51 shares were voted against, Proposition No. 1; and 53,496 shares were voted in favor of, and 101 shares were voted against, Proposition No. 2; hence, both propositions submitted to the stockholders carried by a vote of 92 per cent of the outstanding number of shares of stock of the defendant corporation.

A meeting of the board of directors of the defendant Missouri corporation was held on August 5, 1922, whereat the proceedings and result of the stockholders' meeting were reported to the board, whereupon the board authorized the president of the corporation to transfer and convey to the Wagner Electric Corporation, the new Delaware corporation, all of the property, business and assets of the corporation, and to execute and acknowledge all necessary and proper deeds and instruments to accomplish the same, in consideration of the delivery to the Missouri corporation of 58,277.7 shares of the no-par-value common stock of the Delaware corporation and the agreement of the Delaware corporation to assume and pay the debts and liabilities (including the bonded indebtedness) of the Missouri corporation.

The plan was consummated one week later, on August 11, 1922, on which day Smith, Moore & Company delivered to the defendant corporation and to the new Delaware corporation their certified checks, aggregating $4,000,000, representing $2,500,000 paid for the issue of bonds of defendant corporation, and $1,500,000 paid for the preferred stock of the Delaware corporation. The bonds and preferred stock were then delivered to Smith, Moore & Company, to-

gether with the check of defendant corporation for $187,500 (7½ per cent cash commission upon the principal of the bonds) and certificates for 20,000 shares of the no-par-value common stock of the Delaware corporation. The defendant Missouri corporation then delivered the deeds, bills of sale, and other instruments of title to the Delaware corporation, and the Delaware corporation delivered to the Missouri corporation its written agreement, or obligation, to assume and pay all indebtedness of the Missouri corporation, together with certificates for 58,277.7 shares of no-par-value common stock of the Delaware corporation, exchangeable share for share for the outstanding shares of common stock of the Missouri corporation, as per the agreement. Thereupon, the several instruments of conveyance and transfer were duly filed for record on August 11, 1922, and the Missouri corporation and the new Delaware corporation paid the sum of $3,752,489, with accrued interest, being the proceeds of the Smith-Moore plan, to the creditor banks in payment of the indebtedness of the Missouri corporation, and the creditor banks canceled the several notes of the Missouri corporation evidencing such indebtedness and delivered the canceled notes to the Missouri corporation.

The evidence tended to show that the defendant Missouri corporation had made an operating profit of approximately $360,000 during the five months immediately preceding the sale and transfer of its assets to the Delaware corporation, without deducting, or laying aside, however, any sum for depreciation of plant, equipment and inventory. On August 11, 1922, the day of the transfer of the assets, the gross book value of the assets transferred to the Delaware corporation aggregated approximately $10,000,000, and the net book value of said assets, after deducting liabilities, aggregated approximately $5,000,000. The patents and patent rights of the Missouri corporation were carried at a nominal value of one dollar, although Mr. Layman estimated that such patent rights might be worth (to the corporation) the sum of $100,000, and nothing was allowed for good will, although a competitor of the Missouri corporation had put an estimated value of $1,500,000 upon the good will of the corporation in 1920.

The Delaware corporation was organized in July, 1922, with an authorized capital of $3,000,000 preferred stock, of which $1,500,000 was paid in as the proceeds of the sale of preferred stock to Smith, Moore & Company (the remaining $1,500,000 of said preferred stock being unissued), and 80,000 shares of no-par-value common stock, paid for with the assets transferred by the Missouri corporation. The Delaware corporation was licensed, or authorized, to do business in Missouri on August 5, 1922. The officers and directors of the Delaware corporation were practically identical with those of the Missouri corporation; in other words, the officers and directors of the two corporations were interlocking. The evidence tended to show

that the new Delaware corporation had made an operating profit from the date of the transfer of assets by the Missouri corporation up to the time of trial of the instant suit, and that the Delaware corporation was continuing the business operations previously conducted by the Missouri corporation.

During the *interim* of one week between the stockholders meeting on August 4, and the transfer of the assets of the old to the new corporation on August 11, 1922, none of the plaintiffs herein took any action, nor did they advise either corporation, or any of the interested parties, of any intended action, to prevent the carrying out of the Smith-Moore plan. On the evening of August 11, 1922, after the plan had been consummated, the deeds and instruments of transfer had been recorded, the moneys had been paid by Smith-Moore & Company, the bonds and stock had been delivered, and the outstanding notes of the Missouri corporation had been paid, and surrendered by the creditor banks, the plaintiff Leahy mailed a letter to Mr. Layman (which letter was received by Layman on August 12) protesting against the transfer, to which Mr. Layman answered by letter of the same date, advising that the transfer had been completed. The Delaware corporation has ever since continued the operations and business of the old Missouri corporation. As heretofore stated, the instant suit was not commenced until November 18, 1922, more than three months after the plan and transfer of assets had been consummated. The evidence tends to show that, in the meantime, the members of the respective underwriting syndicates, organized by Smith, Moore & Company, had purchased and paid for their pro rata share of bonds and preferred stock, and Mr. Moore of the latter company testified that he "understood it (the preferred stock) has all been sold to the public." However, it is not controverted that Smith, Moore & Company paid to the two corporations, the old and new, the aggregate sum of $4,000,000, and that the respective corporations received their respective shares and enjoyed the benefits thereof. There was some evidence that sales had been made, or listed, upon the St. Louis Stock Exchange, of both the preferred and the common stock of the new Delaware corporation, but these sales apparently were made, or listed, after the commencement of the instant suit.

After submission of the cause and taking the same under advisement, the chancellor below, on December 30, 1922, entered a final order, or decree, dismissing the plaintiffs' bills and dissolving the restraining order theretofore made. The chancellor, at the time of entering such final order, filed a written memorandum of his findings in the cause. While such memorandum may not properly be deemed a part of the record herein, nevertheless it indicates the views of the chancellor respecting the facts and the law of the case. Therefore,

it may not be inappropriate to quote herein certain portions of that memorandum, as follows:

"Plaintiffs' contention is that the directors were working upon a scheme to meet with the requirements of the Dissolution Act of 1921. Defendants' contention is to the contrary, and thus endeth the controversy.

"It is admitted that plaintiff Leahy objected, as did Greer, throughout the entire proceedings. Plaintiffs' contention is that the company was not in an insolvent condition, for the reason that its assets far exceeded its liabilities by some five million dollars, based upon inventory. However, what would have happened had the banks closed in upon the company leaves no room for conjecture.

"The procedure had in the transfer of the assets of the old to the new company was nothing short of a consolidation or amalgamation of the companies, for that matter, and had plaintiffs made application prior to the transfer thereof at a time when they had some two or three months' advance notice of what was about to take place, there would have been no question as to their rights in the matter. . . .

"In the case at bar, the testimony shows that, on August 11, 1922, a transfer of all of the physical assets of the old corporation was made to the new; the bonds had been sold and disposed of to the public in general, as well as $1,500,000 worth of preferred stock and non-par stock. Plaintiffs stood by until the 18th day of November, 1922, before making this application for the appointment of a receiver. In the meantime, the new company had been making its contracts and proceeding with its work. . . . .

"Eliminating the question of *ultra vires,* as claimed by plaintiffs, the plaintiffs were guilty of laches, and to attempt to undo that which the plaintiffs sat by and permitted to be done would be productive of a great deal more injury to strangers to the entire transaction, who have gone out into the market and purchased, than any good that could possibly come from such action by the court.

"Plaintiffs have not asked for damages in this case, and, in view of what has been said heretofore with reference to the law, there is no relief which can be had on the pleadings as they stand."

Motion for a new trial was duly filed by plaintiffs, and, on January 15, 1923, two weeks after the entry of the final order and decree. plaintiffs filed an unverified motion to set aside the submission and to reopen the case for the purpose of receiving additional evidence. The respective motions aforesaid were overruled by the trial court and the several plaintiffs (except Newell, administrator of the Kerens estate) have appealed to this court.

I. Appellants contend that the Smith-Moore plan, which was adopted by vote of the holders of approximately 92 per cent of the

outstanding capital stock of the defendant Missouri corporation and  which was consummated on August 11, 1922, is an unlawful attempt to compel the minority stockholders to take shares of common stock in the Delaware corporation in exchange for an equal number of shares of common stock in the Missouri corporation, or nothing; that a minority stockholder cannot be deprived of his right to hold stock in the corporation of his own choosing, nor is he required to take, in exchange therefor, stock in another corporation, even though it may prove advantageous or profitable for him to do so; that the evidence herein clearly establishes the fact of the solvency of the defendant corporation, at the time of the consummation of the Smith-Moore plan, and hence that the act of the Missouri corporation, in transferring all of its assets to the Delaware corporation, and in accepting 58,277.7 shares of common stock of the Delaware corporation in consideration of such transfer, was *ultra vires* and void, rendered the Missouri corporation incapable of doing business under its charter, and in effect amounted to an unauthorized and illegal dissolution of the Missouri corporation. Respondents, on the other hand, contend that, when a corporation cannot raise the money necessary to pay its debts, and is in danger of receivership (even though it be not insolvent in a legal sense), then the corporation, by vote of a majority of its outstanding capital stock, may sell and convey its assets in order to save something for the stockholders; or, as otherwise expressed, respondents contend that unanimous consent of the stockholders is only required when the corporation is a going concern and is able to meet its obligations, or to provide for the extension thereof. Respondents also contend that the evidence herein clearly establishes the fact that the defendant corporation, although possessing combined fixed and liquid assets greatly in excess of its current liabilities, nevertheless was unable to meet its maturing obligations, or to arrange for a further extension thereof, and hence that the sale and transfer of its assets to the Delaware corporation for a fair consideration was not an *ultra vires* and void act, but is sustainable upon judicially determined legal principles. Interesting as the questions of law and fact presented by the foregoing contentions of respective parties may be, and ably and fully as those several contentions have been presented and briefed by respective counsel, we find it unnecessary herein to consider or rule such questions, for, in our opinion, appellants, by reason of their laches, are not entitled to the equitable relief prayed; or, stating the ground of our ruling somewhat differently, under the facts in evidence herein and upon the holdings heretofore announced by this court in similar cases, we believe that, if appellants have suffered any actionable wrong resulting in damage to them, appellants

have an appropriate and adequate remedy at law, and, furthermore, that to apply such equitable remedies herein would cause more injury than they would remedy.

The record before us discloses that the Smith-Moore plan was fully disclosed to the stockholders (including appellants) of the defendant corporation by the letters of the president and Stockholders' Committee, respectively, which were sent to the stockholders on or about May 31, 1922. The proposed plan was again called to the attention of the stockholders by the letter of the Stockholders' Committee of June 10, 1922. The call of the stockholders' meeting held on August 4, 1922, was first published on June 1, 1922, and thereafter, for twenty-two times, until August 3, 1922, and the published call fully advised the stockholders of the purposes of the meeting and the several propositions to be submitted and voted upon at such meeting. It is true that, meanwhile, the appellants, Leahy and Greer, voiced their protest against the plan, not only on behalf of themselves, but on behalf of their co-plaintiffs herein. In so doing, it is clearly apparent to us, and in fact appellants do not claim otherwise, that appellants were fully advised of the details of the proposed plan, and that the plan was to be effective if at least ninety per cent of the outstanding capital stock of the defendant corporation were voted in favor of the plan at the stockholders' meeting called for August 4, 1922. Notwithstanding the fact that appellants had notice of such meeting, none of them attended or voted upon the several propositions submitted at such meeting. Both Leahy and Greer testified that they thought that it was not worth while, and therefore useless, to attend the stockholders' meeting, because they were advised that more than ninety per cent of the outstanding stock would be voted in approval of the plan; which testimony indicates to our minds that appellants knew, or at least believed, that the plan would be consummated immediately or shortly after the stockholders' meeting. One week elapsed between the date of the stockholders' meeting and the consummation of the plan by transfer of the assets by the Missouri corporation to the Delaware corporation and the payment of the consideration therefor. During that week, neither Leahy, nor Greer, nor any of appellants, indicated, by letter or otherwise, that they would not abide by the decision and vote of the majority stockholders, or that action would be taken by them to prevent the consummation of the plan and the sale and transfer of the assets of the defendant corporation. On August 11, 1922, Smith, Moore & Company, acting for themselves and the two underwriting syndicates, paid over to the Missouri and Delaware corporations the aggregate sum of $4,000,000; and the instruments of transfer of the assets of the Missouri corporation were delivered to the Delaware corporation and placed of record; the $4,000,000 received from Smith, Moore & Company was paid by the Missouri and Delaware corpora-

tions to the creditor banks and other creditors of the Missouri corporation; the outstanding notes and obligations of the Missouri corporation were canceled and delivered to it; the certificates of stock, preferred and common, of the Delaware corporation were issued and delivered to the purchasers thereof, and according to the testimony of Mr. Smith of Smith, Moore & Company, he understood that the preferred stock was thereafter sold and passed, in turn, to the general public; the Delaware corporation took possession of the physical properties conveyed by the Missouri corporation, thereafter continued the operations of the business, and presumably (and as a logical sequence) the Delaware corporation has purchased, and manufactured into finished products, raw materials from commercial dealers therein, and has entered into contractual agreements with such dealers, and others, in the usual and ordinary course of business, on the strength and faith of the ownership of such assets and property by the Delaware corporation. The original bill, or petition, of appellants was not filed until November 18, 1922, more than three months after the plan in question had been consummated. To then untangle the web of contractual and intricate relations which had been spun, and which involved within its meshes the rights of parties who are strangers to appellants' suit and not named as defendants therein, would in truth require the unerring wisdom of a Solomon, much less the sound discretion of a chancellor.

This court, en banc, in Tanner v. Lindell Railway Co., 180 Mo. 1, has ruled the question of appropriate and adequate remedy upon somewhat similar facts. In that case, which was one in equity, plaintiffs alleged in the petition that they were stockholders in the Lindell Railway Company; that the individual defendants, constituting the officers and board of directors of the Lindell Company, had conspired with a certain banking concern and others to sell all the assets, franchise and properties of the Lindell Company to a corporation to be formed, controlled and managed by themselves, without regard to the rights of other stockholders; that the assets of the Lindell Company were accordingly transferred to the United Railways Company, another corporation, without the knowledge or consent of plaintiffs and in fraud of their rights; that the United Railways Company thereupon predicated an issue of its capital stock and a bonded indebtedness, in the aggregate sum of $90,000,000, after which the United Railways Company leased all such properties to the St. Louis Transit Company, as an operating corporation. The petition alleged that the scheme was kept secret from the plaintiffs and was not known to them until after the plan had been consummated, and the petition prayed that the deed from the Lindell Company to the United Railways Company be canceled, that the lease to the Transit Company, and the mortgage securing the bond issue, be

canceled, and that the property of the Lindell Company be restored to it unincumbered, that the Transit Company account to the Lindell Company for the earnings of its property, and for general relief. A demurrer to the petition was sustained, judgment was entered thereon, and plaintiffs appealed. In affirming the judgment entered below, we said: ''The legal proposition which lies at the foundation of the plaintiffs' case is that by the implied contract between themselves, the corporation and the other stockholders arising out of the relation of corporation and stockholders, the property of the corporation was to be used to carry on the business for which it was created and that it was not lawful for the board of directors without the unanimous consent of the stockholders to sell all of its property and thereby render it incapable of doing business . . . They ask that the sale be set aside and that the Lindell Company be rehabilitated in its former property and set to work under its own charter. This they ask, not upon a showing that any wrong has really been done them, not that the transaction was not fair and profitable, not that they were not afforded an opportunity of participation in it to the same extent that was accorded the most favored, but upon the bare, naked legal proposition that it is a violation of the implied contract between the stockholders *inter sese*, to sell the property of the corporation so as to disable it from doing business without the consent of all. To concede to the plaintiffs the right to annul the sale under those conditions would be to place the holder of one share of stock in position to dictate to the majority the terms on which a sale might be made, giving him an advantage which reason and justice cannot approve. That is not the law. If, under those circumstances, the sale was a breach of the implied contract *the courts of law are open to the plaintiffs to sue for damages for the injury, but there is nothing in the case to arouse a court of equity into action.* If the court should grant the plaintiffs' request and set aside this sale, who can foresee the consequences that *might* result? What would become of the interests of those people who *may* have invested in the $45,000,000 of stock of the United Railways Company, or those who *may* have invested in the mortgage bonds or in the stock of the Transit Company? If the deed from the Lindell Company to the United Railways Company be set aside, all the investments that *may* have been made on the faith of that deed must fail. *It is not necessary in order to redress the plaintiffs' wrongs that any such remedy be applied.* They are entitled to recover, in a proper proceeding, the value of their stock at the time of its conversion, if they elect to consider it a conversion, or they are entitled, if they so prefer, to have the same proportion of United Railways stock given to them in exchange for their Lindell stock that was given to the individual defendants in exchange for theirs, or, if they prefer to hold their

Lindell stock, they may have their proportion of the earnings of the Lindell property in the hands of the United Railways Company or the Transit Company, but they are not entitled to pull down the whole new structure that has been built upon the properties that have been transferred to the United Railways Company under the circumstances stated in the petition. . . . This is a suit in equity, wherein the plaintiffs repudiate the contract their business associates have assumed to make for them; the court cannot, therefore, give them a money judgment, as in an action at law, on a theory of ratification of the contract. Nor can they, while repudiating the transaction and refusing to surrender their stock, receive stock in the United Railways Company in exchange. Neither is there any foundation in the petition upon which the court could build a decree admitting the plaintiffs to a participation in the earnings of the United Railways Company, or its lessee; in the form of dividends on their Lindell stock. The petition is not drawn on any such theory.'' (Italics ours.)

In a later case, Johnson v. United Railways Co., 227 Mo. 423 (which was likewise a suit in equity by a stockholder of the St. Louis Transit Company for rescission of a certain tripartite agreement between the Transit Company, the United Railways Company, and a certain brokers', or bankers', syndicate, to set aside the surrender and cancellation of the lease of the Railways Company to the Transit Company, and the sale or transfer of the bonds, stocks and assets of the Transit Company to the Railways Company and the brokers' syndicate; to restore the Transit Company to possession of its properties; to require an accounting from the defendants; and for an auxiliary injunction), this division of this court followed the holding of the Court en Banc in the Tanner case, and affirmed the judgment *nisi* sustaining a demurrer to plaintiff's bill. We therein said: ''Nor was there error in ruling on that demurrer from the viewpoint of a bill for rescission. Specific performance and rescission are not wholly reciprocal remedies, but it may be safely said that rescission is the converse of specific performance and that cancellation is a mere auxiliary to make rescission effectual. It is clear that rescission looks to restoring the *status quo;* in rescission payments made and benefits conferred must. be returned. Now, as already said, allegations of this bill are of such sort as preclude the practicability or even possibility of such restoration. As specific performance is somewhat of grace, the reciprocal remedy of rescission is also administered by the exercise of a just and sound discretion, precisely as is injunction. . . . Learned counsel for plaintiff has furnished us with a brief prepared with elaborate diligence, but we need go no farther than to a late case in our own court, Tanner v. Railway Co., 180 Mo. 1. . . . On the authority of that case, therefore, we rule that the bill in the case at bar does not state facts sufficient

1060

to constitute a cause of action in equity for rescission. It is not necessary to restate the reasoning there employed; for that case must be taken and considered with this. It is authority for the propositions that, where minority stockholders do not consent to a sale of the corporate properties, and the sale has already gone into effect, *rescission will not be decreed where it will be productive of more injury than would result from a refusal of it, or where the asking stockholder stands by until the rights of strangers not parties to the suit and the public generally have attached;* that when a person becomes the owner of shares in a corporation his right to the equitable relief of rescission of corporate sale is modified by the fact that he holds a small portion of the stock, and if such stockholder has an adequate remedy by a suit at law for his injuries from wrongful conduct whereby his stock is converted or its market value taken from him, the powers of an equity court will not be set in motion to work a rescission. . . . It may be that the silence of the former owner of the stock plaintiff now holds did not show consent to the scheme for an exchange of stocks as provided in the tripartite agreement and that plaintiff was not obliged to take his *pro rata* share of United Railways stock in exchange for his Transit stock—it may be that plaintiff's stock had a market value and that what was done amounted to a wrongful conversion of the value of his stock. Under such conditions, he is not without his adequate remedy at law for damages, as pointed out in the Tanner case.'' (Italics ours.)

Again, in Cummings v. Parker, 250 Mo. 427, wherein a hunting-and-fishing club, by vote of a majority of its outstanding stock, had sold its properties and assets to a similar corporation having practically the same directorate, and plaintiff, as a dissenting stockholder of the old corporation, sought a rescission of the sale, this Division, speaking through Judge LAMM, said: ''In such a case as this rescission does not go as of course. It goes on equitable principles, if at all, and equity must be done, if possible, as the price of the decree. This record does not disclose how the *status quo ante bellum* may be restored. Certainly Fish Club cannot in this suit get back its preserves, without which its club facilities would amount to little. . . . Nor is it apparent that it is able to pay back the price received, which it may or may not now have in its treasury. Nor does plaintiff's bill run on the theory of doing equity as the price of a decree in his favor. Nor is it sought to avoid the lease from Realty Company (which is not a party defendant) to Shooting Club (which is). Finally, the general rule in hand has received an exposition by this court, that, if applied here as it must be, goes a long ways towards affirming the decree. [Citing and reviewing Tanner v. Railway Co., 180 Mo. 1.] . . . The Tanner case has been followed. It was on its authority that a late case, Johnson v. United Railways Company, 227 Mo. 423, was ruled. . . . The auxiliary relief of

a´ receivership falls with the principal relief, to-wit, rescission, and hence needs no attention if the latter be denied.''

Appellants plant their claim for the equitable relief prayed upon the rulings of this division of this court in Luehrmann v. Lincoln Trust & Title Co., 192 S. W. 1026, and of this court, en banc, in Doe Run Lead Company v. Maynard, 283 Mo. 646. The Luehrmann case was an action at law wherein, according to the opinion, plaintiffs prayed ''judgment for the actual value of the interests represented by their stock in the assets and good will of the Lincoln Company at the time of the alleged conversion, . . . and that such judgment may be declared a lien upon the property of the defendant Guaranty Company and for the foreclosure of such lien.'' The distinction between the right of a minority stockholder to obtain *legal* redress for an alleged wrongful action of the corporation at the instance of the majority stockholders, and *his right to proceed in equity* to overthrow such action of the corporation, is clearly stated and recognized in the opinion in that case. Said this court therein: ''The question of right must not be confounded with the question of remedy; for the majority may, in so far as it affects only their own rights, liquidate on such terms as they may consider desirable. Where this involves the transfer of the entire property of the corporation, equity has been slow to interfere on grounds which may be fairly included in the statement that a remedy at law exists which is equally compensatory and less destructive of interests having no connection with the real controversy. . . . We are satisfied with the reasoning as well as the conclusion of the court in the Tanner case. It correctly makes the distinction between the right of the minority stockholder to obtain legal redress for a wrong suffered by the action of the corporation at the instance of the majority in excess of its legal powers, and his right to proceed in equity to overturn a transaction involving important interests with which he has nothing to do, and the disturbance of which is unnecessary to a complete remedy for his own injuries.''

The Doe Run Lead Company case was a statutory proceeding for the dissolution of that corporation, brought by it against certain dissenting and objecting stockholders, as parties defendant. By virtue of the Dissolution Statute, the objecting stockholders were in court, willy-nilly, and the appropriateness and adequacy of their remedy, if they had elected to bring a suit in their own behalf, was not there in question. Furthermore, the learned author of the opinion of the Court en Banc in that case reviews the Tanner case, and remarks that ''the decision (in the Tanner case) was obviously just, but it turns upon a widely different state of facts from that with which we are called upon to deal in this case, and announces no principle in conflict with those here announced.''

Appellants cite Byrne v. Schuyler Electric Manufacturing Co., 65 Conn. 336; Knoxville v. Knoxville & Ohio Railroad Co., 22 Fed. 758; Holt v. California Development Co., 161 Fed. 3; and Central Transportation Company v. Pullman's Car Co., 139 U. S. 59, in support of the claim that they are not estopped by their laches to sue for the cancellation, or rescission, of an *ultra vires* contract and the setting aside of the transfer of the assets of the defendant corporation thereunder. We have carefully analyzed the cited cases, and, while we deem them distinguishable from the instant case upon the facts, suffice it to say that our conclusions herein accord with the established principles of law and procedure announced by this court in the Tanner case and subsequent cases, above quoted, regardless of the rule announced in other and foreign jurisdictions.

Appellants insist that the burden rested upon respondents to establish the affirmative defenses of laches and estoppel, and also to establish the fact that the rights of innocent strangers to the litigation had intervened prior to the commencement of the instant suit; furthermore, that there is no substantial evidence herein upon which can be predicated a finding of laches or estoppel, or a finding that injury will result to innocent strangers if the equitable relief asked by appellants be granted. A close study of the record, however, convinces us that there is substantial evidence of unreasonable delay on the part of appellants, and that the rights or interests of innocent strangers have intervened to such an extent that to grant the equitable relief prayed by appellants will be productive of greater injury than will result from a refusal of it. We also think that the respondents have sustained the burden of proof placed upon them by reason of the affirmative defenses pleaded in their answer.

II. It is claimed by appellants that the Tanner, Johnson and Cummings cases, supra, are distinguishable from the case at bar, because the relief asked herein by appellants is of a wholly different character than that asked in the above-cited cases. Our attention is called to the fact that the Delaware corporation is not a party to this suit and that the setting aside of the sale of the assets to the Delaware corporation is not prayed and such relief cannot be given herein; that the specific relief prayed in the bills herein is the granting of an injunction to restrain the directors of defendant Missouri corporation from holding a meeting of stockholders to reduce the capital stock of defendant corporation, or to dissolve the corporation; the removal of the directors of defendant corporation; the appointment of a receiver of defendant corporation to proceed, by proper suit, against the Delaware corporation to recover the assets transferred to said Delaware corporation, and to proceed, by appropriate suits, against the directors of de-

fendant corporation for an accounting and for damages; and for general relief. It is argued by appellants that "it will be time enough, when a proceeding is brought against the Delaware corporation, to determine whether a return to the *status quo* can be accomplished without impinging upon the rights of innocent persons; that no rights of innocent parties can be affected by granting the relief asked by appellants herein; and that no harm can result from staying the legal dissolution of defendant corporation until the status of its assets shall have been judicially determined."

We regard the foregoing contention and argument of appellants as specious rather than as sound and substantial. Our statute (Secs. 9755 to 9760, R. S. 1919, as amended by Laws 1921, p. 264 et seq.) provides the method for dissolving a domestic corporation. Section 9758 provides for a judicial proceeding in the circuit court in which "all stockholders who reside in the county wherein said petition has been filed . . . who do not enter their voluntary appearance in said court shall be notified by a summons, under the hand and seal of the clerk of the court, reciting the filing of said petition, its general purpose and nature, and citing them to appear in said court on a day to be named in said writ to show cause, if any they have, against such dissolution," and, furthermore, "in addition to said summons, notice of a general nature and cause of said application shall be given to all other stockholders . . . by publication in some newspaper of general circulation in said county once a week for three weeks consecutively, and proof of service and publication shall be made before any order is made upon such petition." Section 9759, as amended by the Act of 1921 (Laws 1921, page 266), provides for a hearing upon the application for dissolution and the entry by the circuit court of a judgment dissolving such domestic corporation. Thus, a separate, distinct and orderly judicial proceeding for the dissolution of the defendant Missouri corporation is provided by the statute, in which all dissenting stockholders (such as the appellants herein) must, in effect, be made parties defendant; personally served with summons, if they are residents of the county in which the proceeding is instituted, and, in any event, notified by publication; and a hearing and a day in court accorded them. While it is true that Section 9759, as amended in 1921, provides that "no appeal shall be taken from a judgment allowing the dissolution of a corporation under the provisions of this article," nevertheless, as we have ruled, en banc, the withdrawal of the right of appeal does not deprive a stockholder of the corporation of his property without due process of law or deny to him the equal protection of the law. [Dorris Motor Car Company v. Colburn, 307 Mo. l. c. 157.] It therefore would seem to be wholly unnecessary (and, in truth, an unwarranted interference with the judicial powers granted by statute to the circuit

court in dissolution proceedings) to restrain the holding of a meeting of stockholders of defendant corporation to authorize the dissolution of the corporation, in view of the fact that all dissenting stockholders are accorded by statute a judicial hearing thereon and, consequently, are allowed their "day in court," pursuant to due process of law, thereby making it unnecessary to grant the injunctive relief prayed herein. As respects the other equitable relief prayed, we might say that receivership is always a cumbersome, and usually an expensive, proceeding, and one which has a direct and, ofttimes, a depressing, effect upon the sale or market value of the capital stock and other securities of the corporation for which a receiver is applied. If appellants have been wronged or damaged by reason of the acts of which they complain, they have an adequate remedy at law, as pointed out in the Tanner and Johnson cases, supra, making it unnecessary to resort to a court of equity for redress. For us to grant the specific equitable relief prayer herein would mean to afford appellants a remedy by indirection and circuity of action, when they have an adequate, and more direct, remedy at law.

III. Lastly, it is urged by appellants that, should it be found and ruled that there may be innocent purchasers of the securities issued under the plan adopted at the stockholders' meeting of August 4, 1922, then the trial court abused its discretion in refusing to reopen the case, upon the motion of plaintiffs, for the purpose of permitting plaintiffs to offer proof that the securities had not passed into the hands of innocent purchasers. The record before us discloses that the answer, by way of defense, pleads laches and estoppel, and that the securities "long prior to the bringing of this suit passed into the hands of bona-fide purchasers and are still so held by them." The answer was filed on December 5, 1922. On December 8, 1922, counsel for the respective parties in open court agreed that the cause be heard on the merits. The hearing of testimony was concluded on December 13, 1922, whereupon the court announced that the cause would be taken as submitted and the judgment and decision of the court rendered at a later date. Plaintiffs did not then ask for leave, or for time, to offer additional evidence, or that submission be withheld. The court rendered decision and entered judgment on December 30, 1922. Within four days thereafter, plaintiffs filed their motion for new trial. Plaintiffs did not file their motion to reopen the case and set aside the submission until January 15, 1923, more than two weeks after the entry of judgment. It appears to us that plaintiffs were fully apprised, by the answer, of defendants' defense that the securities which had been issued by the Missouri and Delaware corporations, respectively, had passed into the hands of innocent and bona-fide purchasers; the answer and the reply clearly raised that issue. If plaintiffs had evidence to the contrary, they had ample opportunity

to offer such evidence upon the trial, or to ask leave of the court to offer the same before judgment was entered. The denial of plaintiffs' motion was, we think, within the sound discretion of the court, and we find nothing upon the record indicating that such discretion was abused.

If the acts complained of by appellants are *ultra vires* and void, and if appellants have suffered injury or damage therefrom (matters which, in view of our holding herein, we do not find it necessary to rule), nevertheless it is clear, under the above-cited and quoted announcements of this court, that appellants have an appropriate and adequate remedy at law, and that the equitable relief prayed herein, if granted, will be productive of greater injury (by reason of changed conditions and the intervening rights of strangers to this suit) than will result from a refusal of it. It follows that the judgment *nisi* must be affirmed, and it is so ordered.

PER CURIAM:—This cause coming into Court en Banc, the foregoing divisional opinion of SEDDON, C., is adopted as the opinion of the Court en Banc. All concur, except *Walker, C. J.,* and *Graves, J.,* who dissent.

### ON MOTION FOR REHEARING.

PER CURIAM:—Appellants urge in their motion for rehearing that the Court en Banc in adopting the divisional opinion herein, has overlooked Section 9792, Revised Statutes 1919, which provides, among other matters, that "'the secretary of state shall not license any foreign corporation to do business in Missouri when it shall appear that such corporation was organized under the laws of a  foreign state by citizens and 'residents of Missouri for the purpose of avoiding the laws of this state, as it would be a fraud upon the laws of both states, and its pretended incorporators would 'be held as partners, and as such become liable for the debts of the alleged corporation,'' and has also overlooked the decision of Division One in the case of Booth v. Scott,'276 Mo. 1, construing the purpose, application and effect of that statute. Neither the aforesaid statute, nor the decision above referred to, was called to the attention of Division One, in oral argument or brief, at the time of the presentation and submission of this cause in division, or prior to the rendition of the divisional opinion. The matter was presented, however, in the submission of the cause in this court, en banc, and has had our full 'consideration, with the result that our conclusions are in accord with the conclusions reached in the divisional opinion, which has been adopted as the opinion of Court en Banc.

It was urged by appellants in the presentation of this cause in Court en Banc, and is again urged in their motion for rehearing, that it is indisputably shown by the record herein that the sole object and purpose of the organization and incorporation of the Delaware corporation was to enable that corporation to issue and sell $1,500,000 in preferred stock, which the Missouri corporation was unable to do because of inability to obtain the consent of all its stockholders, and because of the inhibition of Article 12, Section 10, of our State Constitution, which provides that ''no corporation 'shall issue preferred stock without the consent of all the stockholders.'' Assuming that such was the sole purpose and object of the incorporators of the Delaware corporation, 'does it follow therefrom that the organization of the Delaware corporation was had for the purpose of avoiding the laws of this State, within the purview, meaning and intent of the statute aforesaid? We believe not. Article 12, Section 10, of our Constitution, requiring the consent of all stockholders of a corporation to an issue of preferred stock, has application only to a Missouri corporation, and not to a foreign corporation. The Delaware corporation, so far as the record shows, was duly and legally incorporated in the State of Delaware with an authorized preferred capital stock of $3,-000,000, of which $1,500,000, 'or one-half thereof, was issued and paid for in cash, by and with the consent of all the stockholders of the Delaware corporation. The authorized common capital stock of the Delaware corporation consists of 80,000 shares of non-par-value, which the evidence shows was paid for by tangible. physical properties, real and personal, sold to and purchased by the Delaware corporation from the Missouri corporation. The organization and 'capitalization of the Delaware corporation, so far as the record shows, fully complies with the corporation laws of this State. Whether its organization and capitalization was in accord 'with the corporation laws of Delaware was a matter primarily for that state and its officials to determine; but presumably, at least, the Delaware laws were fully complied with; otherwise, a certificate of 'incorporation would have been withheld, and would not have been issued, by the State of Delaware, and there is no showing upon the record that the Delaware corporation was incorporated in fraud 'or in derogation of the laws of that state. If the incorporators of the Delaware corporation had elected to incorporate under the laws of Missouri, with the same and identical form of organization, corporate purposes, and capitalization, we 'know of no law of this State, organic or statutory, by which the officials of this State could have rightfully denied the incorporators a certificate of incorporation, for it nowhere appears in the record, nor do we understand appellants to contend, that the objects, purposes, and corporate powers of the Delaware corporation are not entirely compatible with those for which a manufacturing and business corporation may be organized

under the laws of this State, or that its corporate powers and purposes are inimical to the public policy of this State. And, furthermore, its capitalization is in entire harmony with the laws of this State respecting the capitalization of a domestic corporation.

In our view of the matter, the statute upon which appellants now place their reliance (Sec. 9792, R. S. 1919, supra) was intended by the Legislature to apply to such corporations as are organized under the laws of a foreign state, by citizens and residents of this State, whose corporate powers and purposes are inimical to, and not in harmony with, the laws and public policy of this State, or whose capitalization is not in harmony with the laws of this State on such subject. The decision of Division One in the case of Booth v. Scott, 276 Mo. 1, so strongly relied upon by appellants, deals with such a foreign corporation, for there it appeared that the articles of incorporation of the foreign corporation provided that its authorized capital stock of $1,000,000 was to be paid into the corporation "at such time as the board of directors may direct," and more than one-half of its authorized capitalization was to be issued and delivered to the incorporators, and as a bonus to the purchasers of its preferred stock, without the payment into the corporation of either cash or property as compensation therefor. Such plan of incorporation and corporate capitalization, it is quite evident; was not in harmony with the laws of our own State on the subject, and apparently was so out of harmony with the laws of this State that the foreign corporation so organized never applied to the Secretary of State of Missouri for a license or authority to do business in this State.

In the case of State ex rel. v. Cook, 181 Mo. 596, this court, en banc, in discussing the application, purpose and meaning of the above statute, said (1. c. 602, 603): "It is not asserted that relator (a New Jersey corporation organized by citizens and residents of this State) has in any particular failed to comply with the laws of New Jersey, and it is not suggested that the business it proposes to transact in this State is in contravention of any law of this State; on the contrary, a reading of the articles will demonstrate that they are such as are recognized by our laws providing for the incorporation of domestic business corporations. It is conceded that the general purposes for which this company is organized are not in contravention of any law, either of New Jersey or Missouri. . . . Looking to our statutory provisions for the public policy of the State, it will be readily observed that we have adopted a most liberal comity toward corporations organized under the laws of other states and countries. Indeed, we have placed them upon substantially the same footing as our own domestic corporate bodies and given them the same powers and subjected them to the same obligations that are provided for like corporations in this State. . . . We have nowhere prohibited such foreign corporations

from doing business in this State on account of the citizenship of the incorporators, save in the proviso to 'the Act of 1903, and in that proviso the fact that our citizens are the incorporators does not bar such corporations, but on the contrary the implication amounts to a positive permission, provided only they have not formed such corporation *for the purpose of evading our laws.* When, therefore, such' foreign corporation presents itself for admission to the State and not only shows that its articles provide powers and a business not opposed to our laws, but such as we grant to our own like domestic corporations, there is nothing in the proviso to the Act of 1903 which would exclude them. 'It is only if some rule of law or principle of policy adopted by a State would be interfered with by allowing a foreign corporation to transact business within its jurisdiction, that the usual comity will be refused.' [2 Morawetz on Private Corporations (2 Ed.) ꞏp. 925.]"

The organization and incorporation of the Delaware corporation, in our opinion, cannot be deemed to have been had for the purpose of avoiding or evading the laws of this State, within the intent and meaning of the quoted proviso of Section 9792, supra. It does not appear from the record herein that the corporate powers and purposes, or the capitalization,'of the Delaware corporation, conflict, in any respect, with.the laws and public policy of this State, or that the organization of the Delaware corporation amounts to a fraud upon the laws of this State or of the State of Delaware. Consequently, the organization of the Delaware corporation was not a void act, as appellants contend, and the transactions between the Delaware corporation and the Missouri corporation were not 'made void by reason of the organization of the Delaware corporation. We, therefore, adhere to the conclusions expressed in the divisional opinion, adopted as the opinion of the Court en Banc, and the appellants' motion for rehearing is overruled. All concur, except *Walker, C. J.,* and *Graves, J.,* who dissent.