LINNIA ROMBAUER ET AL., Appellants, v. COMPTON HEIGHTS CHRISTIAN CHURCH ET AL.—40 S. W. (2d) 545.

Division One, June 12, 1931.

2

*Edgar R. Rombauer* and *Frank X. Hiemenz* for appellants.

4

*Abbott, Fauntleroy, Cullen & Edwards* for respondents.

ELLISON, C.—Suit in equity to enjoin the violation of certain restrictive covenants alleged to govern the use and improvement of lots 1 and 2 and the north twenty-five feet of lot 3 in block 2118 of the city of St. Louis, situated at the southwest corner of the intersection of Grand Boulevard or Avenue with another thoroughfare variously called Flora Avenue, Flora Boulevard and Flora Place. On March 8, 1897, the then owner of the above tract and divers other persons owning all of the other real estate abutting on both sides of Flora Avenue for a distance of nearly a mile signed a written agreement restricting their properties and looking to the improvement of that street at private expense. The agreement is recorded in book 1393, page 384, office of the Recorder of Deeds for the city of St. Louis. Among other things it contained covenants severally binding the signers, their heirs, successors and assigns, not to erect buildings on their respective tracts other than private residences costing $4,000 or more, the same to be used only as such, and they and the appurtenant outbuildings to be set back at least seventeen feet from the street line, with not more than one residence for each fifty feet of frontage of each owner.

The plaintiffs own certain of the lots protected by the agreement as successors in title of signers thereto. The defendant religious corporation, through the defendant trustees, owns the tract involved

in this suit by deed from Henry Nicolaus, a party to the contract, and intends to tear down the residence building thereon and to erect a church edifice in its place. In the meantime the house is being used for certain social and fraternal purposes connected with church work and not as a dwelling. The plaintiffs seek to enjoin these present and contemplated breaches of the contract. The court below found for the defendants and dismissed the plaintiffs' bill. From that decree the plaintiffs have appealed.

The trial court held the restrictive agreement did not cover lot 2 and the north twenty-five feet of lot 3; and as to lot 1 the ruling was that owing to the natural growth and development of the city property in that vicinity fronting on Grand Avenue had ceased to be desirable or valuable for residential purposes, but had value only for other uses; and that the respondents could erect a church there without loss, damage or inconvenience to the appellants, whereas, to enforce the restrictions would destroy the value of the lot. And so it was held the appellants' bill was without equity though the contract did cover lot 1. The evidence bearing on these issues will be set out as fully as is necessary to an understanding of the case.

A plat of the part of Flora Place which immediately figures in the controversy is inserted next below, the respondents' tract being shown in heavy outline.

It will be noticed the three lots composing the tract are 200 feet long and of an aggregate depth of 131 feet, all fronting east on Grand Avenue; and that only lot 1 abuts Flora Place. This lot

alone was put into the agreement by the former owner, Nicolaus. The trial court was undoubtedly right in its ruling on that point, as we shall show later in the opinion. Also, it was proven by the records that in Nicolaus's chain of title there was a deed from a former grantee reciting "the front line of each of said lots . . . is the west line of Grand Avenue," and stipulating no building should ever be erected thereon closer to said line than forty feet. In 1924 the city increased the width of Grand Avenue to one hundred feet, for which twenty feet was or is to be taken off the east end of the three lots here involved, making their length 180 feet.

The residence building on the tract was built by Nicolaus in 1896 before the restrictive agreement invoked by the appellants was signed. It faces toward Grand Avenue and the entire structure is well south, that is to say, outside of, the seventeen-foot Flora Place building restriction line, except that a porch on the north side of the house projects over the line about four feet. (The plat does not show this.) That, however, was not forbidden as to porches by the restrictive agreement, so it can be said the dwelling house conformed to the contract signed by Nicolaus, though it had been built before. Flora Place at that time was unimproved, but there was a roadway with catalpa trees bordering it.

The restrictive agreement was dated March 8, 1897, as we have stated. It was acknowledged by the several signers, respectively, on various dates between March 16 and June 3, 1897. The acknowledgment of respondents' predecessors in title, Henry Nicolaus and wife, was taken on March 17, 1897. The notary's certificate of acknowledgment was signed on June 3, 1897, and the instrument filed for record on June 24, 1897. Contemporaneously certain other things were done.

A collateral agreement bearing the same date as the restrictive agreement was entered into between nearly all of the property owners having lots on the south side of Flora Place, providing for the improvement thereof at private expense, the improvement scheme covering grading, paving, curbing, guttering, sidewalks, shade trees, gas, sewer and water pipes, and a park strip about fifty feet wide in the center of the avenue, "in a manner similar to Vandeventer Place." It was provided title to the water, gas and sewer pipe systems installed shall be held for the benefit of the signers by certain trustees who should dispose of the same, or the right to use the same, to the city of St. Louis, or to other parties, the net proceeds of sale to be devoted to the improvement and maintenance of the park place and superstructure of the avenue. This agreement is recorded in book 1413, page 6, office of the Recorder of Deeds of the City of St. Louis.

While the property owners were making the foregoing arrangements between themselves steps were also being taken whereby the city of St. Louis should have a hand in the development. Nearly a year before, on April 9, 1896, an ordinance had been approved providing for the widening of Flora Avenue to a width of 140 feet along the distance covered by the two contracts, and authorizing and instructing the City Counselor to proceed to that end. And on March 3, 1897, five days before the date of the two contracts, by ordinance the city appropriated $30,884 to pay damages for the widening of the avenue, theretofore assessed in favor of private individuals by the report of commissioners and final decree of the St. Louis City Circuit Court. Some years later, in March, 1913, an ordinance was passed setting aside the park strips along the center of the avenue for park purposes and providing they should be maintained by the Park Department.

During the thirty years from 1897 to the time of the trial below in 1927, the evidence is that the restrictive agreement has always been observed by the owners of real estate in Flora Place in all substantial respects. There are something like 150 residences, some of which could not be reproduced now for less than $100,000. One, built not many years ago, cost about $65,000 or $75,000. Those more recently erected are less expensive, on the average. Appellants introduced over thirty photographs showing many of them. Respondents introduced about fifty photographs from which it appears that six of the lots are vacant and were somewhat littered with rubbish and overgrown with weeds at the time the pictures were taken. A large part of these photographs further show that the *west* side of Grand Avenue for a distance of at least five blocks, both north and south of its intersection with Flora Place, has grown into a business district, in some instances the old residences now being devoted to business uses, but mainly with buildings suitable to the nature of the business.

There was, however, some tendency toward that development back in 1897, when the restrictive agreement was signed. A double-track street railway then as now ran along Grand Avenue, there were a saloon, a drug store and some other business establishments three blocks south of the Flora Place intersection, another saloon and a home for aged people five blocks south, and some business houses and an Episcopal orphans' home the same distance north of the intersection. But even today, on this *west* side of Grand Avenue in the block immediately south of Flora place there are no shops or stores. The only two buildings there, are two old fashioned residences, one occupied by the Liederkranz Club and the other being the Nicolaus house involved in this case. The northwest corner of the intersection is vacant, but there is a store a block further north at the northeast corner of the same block.

On the *east* side of Grand Avenue, however, there appear to be no business buildings for several blocks both north and south of Flora Place intersection. Thus, beginning five blocks north and coming south the Compton Hill Reservoir stretches with an open, parked frontage for a distance of four blocks to within one block of the intersection. In this intervening block are residences mostly if not all used for doctors' offices, and opposite the Flora Place intersection is a recess or *cul de sac* extending east about a block, all of which is restricted to residential uses, called *Flora Court*. From this point for another block south are dwelling houses. Then comes the entrance to Hawthorne and Longfellow Boulevards set off with ornamental double columns of masonry on each side. Thence, so far as the photographs show, Grand Avenue runs south two blocks more to the intersection with Shenandoah Avenue before there are any business houses, though there is testimony about a picture show in that vicinity.

But the evidence for respondents is that all this property on both sides of Grand Avenue for several blocks is practically unsalable for residence purposes, because of the encroachment of business enterprises, stores, shops, apartments, a large apartment hotel, the Missouri Pacific Hospital, undertakers' establishments and the offices of doctors and dentists, as well as one or two gasoline filling stations. The statement was made that only one residence has been built on this part of Grand Avenue during the past fifteen years, and one witness, a real estate agent, said he had tried for ten years to sell a lot at the northwest corner of this same Flora Place intersection, but without success, because of the building restrictions. A number of witnesses for respondents expressed the opinion that a handsome church edifice on the Nicolaus property, set back south at least seventeen feet from the property line and thus meeting the Flora Place building restrictions to that extent (as respondents offer to do) but not as to the character and use of the building, would arrest this commercial development and help Flora Place as a residential district or at least not injure the property therein, except, possibly, the adjacent lots. It was shown, however, that respondents knew of the restrictions when they bought the lots. Appellants say the public use of the building, the congregation of large numbers of people, and the parking of automobiles with the attendant noise and traffic confusion, would detrimentally affect this residential retreat set off years ago in anticipation of the onrush of the busy city; and that aside from these considerations their rights are founded on a contract and not governed by the law of nuisances.

Respondents introduced a zoning map prepared by the St. Louis City Plan Commission. An examination of this shows the property on the east side of Grand Avenue for a distance of about seven blocks

opposite Flora Place is restricted to residential use, that is to say, for five blocks north of the intersection and two blocks south of it. On the west side of Grand Avenue along the same distance it is thrown open as a commercial district except the corner lots abutting on Flora Place. The property on two of the streets that cross Flora Place, namely, Thirty-ninth and Thurman, is marked for commercial use on the map up to the back or alley line of the lots fronting Flora Place, but the whole of Flora Place is shown as restricted to residences.

The photographs disclose that the park strips, fifty feet wide, in the center of Flora Place for its full length of nearly a mile, now have trees grown to mature size along the curb lines, occasional clumps of ornamental shrubbery, some flowers, and a good covering of sod. The driveways are paved and curbed, and next to the property lines are sidewalks and parkways with trees. At its west end, at Tower Grove Avenue, Flora Place faces an entrance to Missouri Botanical Garden, or Shaw's Garden, as it is more generally called. At its east end, meeting Grand Avenue, where the lots here involved are located, is an ornamental entrance shown in the following photograph. The Nicolaus residence is at the left.

I. This action is purely for injunctive relief. It does not involve title to real estate in the constitutional sense. [Nettleton Bank v. McGauhey's Estate, 318 Mo. 948, 955, 2 S. W. (2d) 771, 776.] We take jurisdiction because the record discloses the amount in dispute exceeds $7500. [Secs. 2 and 12, Art. VI, Constitution of Missouri; Secs. 3 and 4, Amendment of 1884; Sec. 1914, R. S. 1929.] There is testimony that the value of the three lots involved is over $65,000 freed of the restrictions sought to be enforced, and that with them on the land it is worth only about $13,000. This evidence and the photographs plainly show the pecuniary amount involved reaches within the jurisdiction of this court. [Aufderheide v. Polar Wave Ice Co., 319 Mo. 337, 356, 365, 4 S. W. (2d) 776, 783, 788.]

II. It is furthermore clear that the restrictive agreement covers only lot 1 of the three lots brought into the suit, and that the chancellor ruled correctly on that question. In their petition and at the trial appellants sought to make the restrictions apply. to all three of the lots, and they state in their brief such is the object of their bill. But evidently that contention is not now seriously urged, for in the course of their argument they say that "respondents have no right. to erect a church or any other building except a strictly private residence on *lot 1* acquired by them from one Henry Nicolaus" (italics ours), thus leaving out and making no reference to lot 2 and the north twenty-five feet of lot 3. But whatever appellants' present position may be, we are convinced the restrictions bind only lot 1. In signing the agreement each owner covenanted only with respect to the real estate he then owned or might thereafter acquire; and each such covenantor indicated after his signature the lots he was putting into the agreement, and their frontage. After the name of Henry Nicolaus the following appears: "1 block 2118, 200 feet 50' block 2117, lot 7." This obviously means lot 1 of block 2118 with a frontage of 200 feet, and another lot, No. 7, in another block, 2117, with a frontage of fifty feet.

III. As we have just stated, the trial court ruled or impliedly conceded the restrictive agreement did apply to lot 1—but refused to enforce it for other reasons. Respondents are satisfied with that result, but say the court should have gone further and held the contract did not cover even lot 1. Their theory is that on a proper construction the agreement bound only property *fronting* on Flora Place and not property merely *abutting* thereon, as is true of that lot. A summary of the contract reviewed with an eye to that contention is as follows. Where italics are used they are ours.

The instrument is expressed to be between owners of lands "*abutting* on Flora Avenue," and recites it is the intention of the parties to have Flora Avenue between Grand Avenue and Tower Grove Avenue "fully improved in a manner similar to Vandeventer Place with the view of making the lots *fronting* on said Flora Avenue suitable and desirable for purposes of residence, and with the view of always maintaining them as a residence district." Then follow the restrictions heretofore mentioned.

Among these restrictions one recites that "where any parcel of land owned by any one covenantor at the present time has a *frontage* on Flora Avenue of fifty feet or less, only one residence building shall be erected thereon." It then continues that where the "*frontage*" of at least fifty feet on Flora Avenue, only one residence build-

ing shall be erected on each such lot "so that the effect of this covenant shall be, that not more than one residence building shall be hereafter erected for each fifty feet of *frontage* in any parcel of land now having a greater *frontage* than fifty feet."

A further restriction is thus stated: "A building line is hereby established, which, as to all property *abutting* on the south line of Flora Avenue is seventeen feet south of said south line; and as to all property *abutting* on the north line of Flora Avenue is thirty feet north of said north line. Each and every party hereto who is owner of property *on the south line* of Flora Avenue . . . covenants . . . that he will not at any time hereafter erect any building on such property, so owned by him north of said building line; that is to say, within seventeen feet of Flora Avenue." Then follows a further provision about towers, balconies, porches, platforms and steps, and a set of restrictions governing the erection of similar buildings and structures on property *"on the north line* of Flora Avenue."

With respect to the binding effect of the covenants on the signers the instrument provides that "each covenantor only binds himself to the observation of the foregoing limitations and restrictions as to such property as he now owns or may hereafter acquire *abutting* on Flora Avenue within the limits above designated." Further along is a recital that "in case of violation or attempted violation by any party hereto his successors, heirs or assigns, of any covenant or agreement above set forth or of any infringement or attempted infringement of any of the easements hereby created, then any one or more of the other parties hereto, their respective heirs, successors or assigns, owners of any property *abutting* on Flora Avenue, within the limits above designated, shall have the right to institute appropriate proceedings in law or equity," and specifically the right to injunctive relief. And concluding, the agreement says that "each party hereto makes this agreement and conveyance with reference to all property he now owns or may hereafter acquire *abutting* on Flora Avenue within the limits above designated."

It is true, as respondents contend, that the words "front" and "side" do not mean the same thing, and that ordinarily when it is said a house or tract fronts on a certain street the meaning is, facing or front side toward that street. [Howland v. Andrus, 81 N. J. Eq. 175, 179, 86 Atl. 391.] But very often "fronting" signifies abutting, adjoining or bordering upon, depending largely on the context. [Meier v. St. Louis, 180 Mo. 391, 410, 79 S. W. 955, 958; Collier's Estate v. Western Pav. & Sup. Co., 180 Mo. 362, 377, 79 S. W. 947, 950; Waters v. Collins (N. J. Ch.), 70 Atl. 984, 985; Henderson v. Champion (N. J. Ch.), 91 Atl. 332, 334; Standard Oil Co. v. Kamradt, 319 Ill. 51, 54, 149 N. E. 538, 539; Turney v.

Shriver, 269 Ill. 164, 169, 109 N. E. 708, 709; City of Des Moines v. Dorr, 31 Iowa, 89, 93.

In this case it is evident from the whole contract that the words "fronting," "frontage" and "abutting" were used interchangeably, always with the thought that the lots put under restriction bordered upon the street about which the development centered. This is true though the instrument be strictly construed, as respondents say it should be. The purpose of the restrictive agreement was to insure uniformity, not only in the use, but also in the character of buildings to be erected and the distance they should be set back from the street line and from each other. And while the Nicolaus tract was platted to face east on Grand Avenue, and by a deed in his chain of title the west line of that thoroughfare was made "the front line" of his lots, and notwithstanding this tract was the only one in the whole restricted area that did abut sideways on Flora Avenue, yet the paper situation had nothing to do with the object the parties sought to attain. So far as the owners of the other lots were concerned the Nicolaus lots did front on Flora Place. They abutted it and a failure to observe the restrictions there would interfere with the improvement scheme as much as anywhere else.

Respondents contend that while the "paper situation" may have made no difference to the other property owners it made a vast difference to Nicolaus. His Lot 1 was a long narrow strip abutting 200 feet on Flora Place and only fifty-six feet wide. The forty-foot Grand Avenue restriction line made only the west 160 feet of the lot available for building purposes, and with the seventeen-foot Flora Place restriction superimposed, buildings could be put only on the south thirty-nine feet of that 160-foot strip. Further, the Flora Place restrictions allowed but one building to each fifty feet of frontage. In other words, after signing the agreement Nicolaus was left in a situation where the maximum amount of building he could do on Lot 1 would be to put three residences on three parcels of ground fifty feet by thirty-nine feet, with ten feet of unrestricted land left over, plus the forty feet resting under the Grand Avenue restriction. Respondents assert it is incredible that he would have thus handicapped himself—intentionally.

But this is not a suit to reform the restrictive agreement. The parties and this court are bound by what it says, and there is no room to exempt his lot by construction. On the contrary, considering the evidence *aliunde* it is not difficult to see why he encouraged the Flora Place development. His lawn fronted 131 feet on Grand Avenue. He had a pretentious home with a two-story stable for twelve horses, both built in 1896, just about the time the improvement of Flora Place was projected. He evidently had faith in the

neighborhood as a residence location. His buildings were already more than seventeen feet back from the Flora Place property line. He knew he would not want to erect additional structures there so long as the premises were used for a home, and very likely he thought its sightliness and value would be enhanced by cornering on a high class residential boulevard such as Flora Place was planned to be. And yet, while he made this concession to the development he showed caution, because he put only lot 1 under restriction though the tract was used as a whole. In our opinion the restrictive agreement clearly covers that lot and the trial court was right in so holding.

IV. As will be recalled that on the same day the property owners made the restrictive agreement here involved, those of them who owned lots on the south side of Flora Place entered into a collateral contract for the laying out, improvement and maintenance of the thoroughfare and park strips at private expense. Sixteen years later in 1913 the city of St. Louis took over the park strips and put them in charge of the Park Department. The respondents pleaded in their answer and contended at the trial that by consenting to this change the appellants, or their predecessors in title, abandoned their right to enforce the separate restrictive agreement protecting their lots, in that they surrendered their privacy and permitted the thoroughfare and parks to be thrown open to the public "white or black," whereas the original restriction plan had been to have Flora Avenue "fully improved in a manner similar to Vandeventer Place with the view of making the lots fronting on said Flora Avenue suitable and desirable for purposes of residence, and with the view of always maintaining them as a residence district." In Vandeventer Place the thoroughfare and parks were private, and that fact was stressed when this court was appealed to and did enforce restrictions pertaining thereto in Pierce v. St. Louis Union Trust Co., 311 Mo. 262, 281, 278 S. W. 398, 403. The court below in the instant case made a finding in its decree that said collateral street improvement contract had been abandoned; that Flora Avenue is now a public street "owned and operated by the city of St. Louis;" and that the park strips in Flora Place are now set aside for park purposes and maintained by the city. This appears to be one of the grounds on which the injunction was denied, though the decree as written is ambiguous on that point. We assume, however, that the trial court would not have made the finding unless it intended to base its decree on it, at least in part.

All the five appellants acquired their three lots, respectively, before 1913 and owned them when the city took over the maintenance

of the park strips that year; and all of these lots are on the south side of Flora Place. The predecessors in title of two of these three ownerships signed the street improvement agreement. And so we shall concede, for the purposes of the case, that if the turning over of the park strips to the city worked a forfeiture, abandonment or waiver of the protection of the separate restrictive agreement, the appellants are bound thereby.

But we think no such consequence followed. Flora Avenue was a public street when both contracts were executed. Otherwise, why was it that the city of St. Louis ordained to pay $30,000 damages for the widening thereof on March 3, 1897, just five days before the property owners' street improvement contract was signed? The facts are not brought out fully, but it is clear there was some kind of concerted action about this matter. As we view the evidence the street improvement contract from the start was an agreement to improve and maintain at private expense a thoroughfare already opened or to be opened to the public, not a private way. And there is reason for believing the signing property owners then hoped to get the city to take over the improvements, or at least a part of them; for there was a provision in the improvement contract that certain trustees should hold the water, gas and sewer pipes for the signers, and dispose of the same, or the right to use the same, to the city of St. Louis or to other parties and apply the net proceeds of sale to the improvement and maintenance of the park place and of the superstructure of the avenue.

There is no evidence that the tone of the neighborhood has been lowered and none that the seclusion of the residents has been sacrificed because of the change in the method of maintaining the park strips. There is no law so far as we know that a restrictive agreement cannot be enforced because the land covered by it abuts on a *public* street. Every reason that ever existed for the enforcement of the restrictions exists now—so far as concerns the particular phase of the case under discussion. If and to whatever extent the ruling of the trial court denying the injunction was based on the fact that the city Park Department has taken over the maintenance of the park strips, we hold it was erroneous.

V. The point most stressed by the respondents in their brief and by the trial court in its decree is that the natural growth of the city has converted Grand Avenue into a business street at the point where Flora Place meets it, in consequence of which the Nicolaus tract is now practically worthless except as a business site: and so it is asserted if the restrictive agreement be enforced and the tract used for nothing but residential purposes its value will be almost wholly

destroyed; whereas, by putting a church there the other property owners will not be hurt—unless possibly those next to it slightly. In other words, respondents' proposition boils down to this: that although the changed condition along Grand Avenue is wholly outside Flora Place, save as to the Nicolaus Lot 1 and another lot at the northwest corner of the same intersection, and although all the (150 about) other lots in the restricted area are still used for residence purposes as originally contemplated except five which are vacant but available for that use, yet enforcement of the restrictions will work such a disproportionate hardship on them (the respondents) as the owners of Lot 1 that appellants' bill should be and was properly dismissed for want of equity. In this connection it should be stated the lot owned by the appellant Linnie Rombauer is on the same side of the street and only three lots removed from the Nicolaus corner—about 123 feet west of it. The two lots owned by the other appellants are near the west end of Flora Place more than half a mile away.

Respondents' brief cites and quotes from numerous cases decided in other jurisdictions. We shall refer to only a few of them, as they, and many others, are reviewed in the comprehensive notes in 28 L. R. A. (N. S.) 706, and 54 A. L. R. 812. It will be sufficient to lay down these propositions.

The general rule is that equity will enjoin the violation of restrictive covenants irrespective of the amount of damage which would result from a breach and even though there be no substantial monetary damage. The covenantee may stand upon his contract and the law will enforce it. [32 C. J. sec. 324, p. 208; Berry on Restrictions, etc., sec. 413, p. 555; Miller v. Klein, 177 Mo. App. 557, 571, 160 S. W. 562, 565; The Kenwood Land Co. v. Hancock Inv. Co., 169 Mo. App. 715, 722, 155 S. W. 861, 863.]

When, however, the restrictive agreement is induced by the then existing condition and surroundings of the realty in the covenanted area, and assumes its continued availability for particular uses, if a radical change takes place in the whole neighborhood such as defeats the purpose of the restrictions and renders their enforcement inequitable and oppressive, equity will not enforce them, but will leave the complainant to his remedy at law. [32 C. J. sec. 328, p. 212; 14 R. C. L. sec. 100, p. 399; Koehler v. Rowland, 275 Mo. 573, 587, 205 S. W. 217, 221, 9 A. L. R. 107.] This is not on the theory that the contract, as such, fails to cover the situation and does not apply to it, for if that were true it would be unenforceable even at law; but it is because the changed conditions forbid equitable intervention.

No hard-and-fast rule can be laid down as to when changed conditions have defeated the purpose of restrictions, but it can be

safely asserted the changes must be so radical as practically to destroy the essential objects and purposes of the agreement. Thus an urban tract may be dedicated to residential use under certain restrictions indicating an intention to establish a secluded district for high-class homes. It is inevitable that with the lapse of time, the march of progress and the shifting and growth of the city the forces of disintegration will be at work, the houses architecturally and otherwise will become more and more out of date, other residential districts still more pretentious may be laid out, and changes may crowd about, outside. But the parties must be deemed to have anticipated these things and to have intended to combat them as far as possible. And so, if later the necessity of invoking the restrictive covenants arises the mere fact that because of changed conditions the restrictions are less valuable than they once were will not prevent their enforcement if the district still retains its essential character and the restrictions remain of substantial value.

Pierce v. St. Louis Union Trust Co., supra, 311 Mo. 262, 278 S. W. 398, was such a case; and another decision cited by respondents, Star Brewery Co. v. Primas, 163 Ill. 652, 660, 45 N. E. 144, is instructive. There, the owner of certain land on which was a saloon sold a vacant part of the tract with a restriction that no saloon should be operated thereon, the object being to prevent competition. A subsequent purchaser sought to abate the restriction on the ground that conditions had changed, because six other saloons had started up in the neighborhood. The Illinois Supreme Court held the defendant's saloon would make just so much more competition for the plaintiff, that the restriction was therefore still of use and value to him, and enforced it.

If no radical change in the condition and use of the restricted property occurs, the circumstances that there have been changes in the territory *surrounding* the covenanted area will not of itself be sufficient to destroy the restrictions. [Pierce v. St. Louis Union Trust Co., supra, 311 Mo. 1. c. 295 et seq., 278 S. W. 1. c. 408.] But this does not mean the purpose of the restrictions can be defeated only by some *physical* change in the usage within the protected district. Thus, for example, a tract restricted to residential use might become surrounded by manufacturing establishments emitting obnoxious odors or gases or otherwise creating objectionable conditions such as would render it totally unfit for use as a residential section, although the manufacturing enterprises causing the changed conditions were not actually located within it.

On the other hand, the mere fact that, because of changed conditions in the adjacent territory, land so restricted to residential use will sell for more money for other uses, does not signify the purpose of the restrictions has been defeated. If it continues to be

reasonably fit for the contemplated residential use, and is so used, the circumstance that it can be sold at a higher price freed of the restrictions simply means each homeowner has a heavier investment in his property. [Pierce v. St. Louis Union Trust Co., supra, 311 Mo. l. c. 299, 278 S. W. l. c. 409; Noel v. Hill, 158 Mo. App. 426, 450, 138 S. W. 364, 371.]

Neither is it true that because a small part of a restricted district, lying along the edge or at the threshold thereof, is forced to bear the brunt of attack from outside commercial expansion, and as a result is impaired in value for the use prescribed by the restrictions—in these circumstances we say, it is not true that the restrictions will be abated as to the part so affected because of the hardship visited upon that particular land as compared with the sheltered portions of the district. [Thompson v. Langan, 172 Mo. App. 64, 83, 154 S. W. 808, 813; Benzing v. Harmon, 219 Mich. 532, 189 N. W. 69.] The very purpose of the restrictions is to protect the property in the covenanted area from such invasions (Trustees of Columbia College v. Thacher, 87 N. Y. 311, 319, 41 Am. Rep. 365); and if the restrictions are of substantial value to the covenantees equity may enforce them, though serious injury result to the servient estate (Batchelor v. Hinkle, supra, 210 N. Y. l. c. 251, 104 N. E. l. c. 631).

As to the effect of changed conditions operating differently on the complainants and defendants it has been said that "the courts in the United States, in many cases of this character, seem to go further than the English courts in denying relief where there has been a change in the character of the surrounding property, by taking into consideration the comparative benefit to complainant and detriment to a defendant resulting from an enforcement of the restriction, without regard to whether the successive owners of the property affected by the restriction have been in any way responsible for the change." [14 R. C. L. sec. 100, p. 400.] But the principal difference between the English doctrine and that followed in America is that in England restrictive covenants will be enforced by injunction *irrespective of changed conditions* if the complainant or his predecessors in title were not responsible for them. [Sec. 28 L. R. A. (N. S.) 707, note; 54 A. L. R. 813, note.] In this country while a radical change in conditions may deter the courts from granting injunctive relief, yet a survey of the leading decisions on the subject will clearly show, we think, that when the complainant comes into court with clean hands and guiltless of any charge of laches, waiver or estoppel, equity will enforce restrictive covenants made for the benefit of his land, *if they remain of substantial value,* even though because of the changed conditions a hardship will be visited on the servient estate. [Berry on Restrictions, etc., sec. 405, p. 547; 32

C. J. sec. 328, p. 212; Brown v. Huber, 80 Ohio St. 183, 88 N. E. 322, 28 L. R. A. (N. S.) 705, 721, and note, p. 719.]

On this point respondents especially rely on the case of Trustees of Columbia College v. Thacher, supra, 87 N. Y. 311, 317, 41 Am. Rep. 365. There a block of ground on Fiftieth Street cornering on Sixth Avenue in New York City was restricted to residential use. Sixth Avenue became a business street and an elevated railroad was built therealong with a station at that corner. The defendants permitted a four-story brown stone dwelling house located on the same corner and overshadowed by the railroad tracks and station, to be occupied by trade and business establishments. The New York Court of Appeals refused to grant injunctive relief, but in doing so expressly invoked and applied the rule that when subsequent events have rendered performance of a restrictive agreement by the defendant so onerous as to make its enforcement impose great hardship upon him and yield *little or no benefit* to the plaintiff (italics ours), equity should withhold its hand. In construing and applying the decision as an authority, this latter fact is pointed out in a later New York case, Rowland v. Miller, 139 N. Y. 93, 103, 34 N. E. 765, 767. We see nothing in the Columbia College case counter to the doctrine that when restrictive covenants still afford the covenantee substantial protection notwithstanding changed conditions in the neighborhood, equity will enforce them.

Respondents refer in their brief to two Missouri cases, Johnson v. United Rys. Co., 227 Mo. 423, 450, 127 S. W. 63, 70-71, and Newell v. Wagner Elec. Mfg. Co., 318 Mo. 1031, 1060 et seq., 4 S. W. (2d) 1072, 1084 et seq. wherein the doctrine was followed that in awarding or denying injunctive or kindred equitable relief the court should "balance the inconveniences likely to be incurred by the respective parties . . . and grant the injunction, or withhold it, according to a sound discretion." And they cite other authorities holding the enforcement of negative covenants by injunction in effect amounts to compelling specific performance of them and is to be governed by the same rules—which lodge a discretion in the chancellor. [27 R. C. L. sec. 538, p. 773.]

This is correct, but respondents overlook one vital proposition. When the granting or refusal of an injunction depends on the rights of the parties under the *general law*, as in the Johnson and Newell cases, supra, where minority stockholders sought to enjoin certain corporate action, the chancellor has a wider discretion than where the issue is as to the enforcement of a *contract* by which a litigant is admittedly bound. In the latter instance—a situation often presented in specific performance cases—the general rule is that if the contract is made complete, fair and untainted by fraud or other vice, specific performance goes as a matter of right. [Beheret v. Myers, 240 Mo. 58, 77, 144 S. W. 824, 830; Kirby v. Balke, 306

Mo. 109, 120, 266 S. W. 704, 708.] This rule may not always be followed in hard cases where relief can be awarded by way of money damages, but certain it is the law will not permit a man to repudiate his solemn restrictive covenants, fairly entered into, merely because changed conditions render it more inconvenient for him to perform than for his adversary to suffer a breach. If the performance of contracts depended on the convenience of the parties there would be little need of having them.

As stated in the beginning, a complainant, on proof of a restrictive agreement for the benefit of his land and of an impending breach thereof by the defendant, is entitled to an injunction without any showing that he will suffer substantial damage. The defense that because of changed conditions injunctive relief should be withheld is an affirmative defense, and the burden rests on the defendant to prove: (1) the radical change in condition; (2) that as a result enforcement of the restrictions will work undue hardship on him; (3) and will be of no substantial benefit to the plaintiff. [Berry on Restrictions, etc., sec. 287, p. 328.]

Now applying the foregoing rather lengthy discussion of abstract propositions of law, all of which are raised one way or another in the respondents' brief, to the facts of this case. There is no question but that the evidence shows a marked change in conditions along Grand Avenue, and that respondents' Lot 1 is seriously affected thereby. But it does not show any such change in or affecting any other part of the restricted area except the one other lot fronting on Grand Avenue. It stands proven without real controversy that throughout its length, for a distance of nearly a mile, Flora Place is still a quiet, orderly and generally well maintained residential district.

The erection of a church would violate the restrictions. It has been so decided on facts not dissimilar. [Hisey v. Presbyterian Church, 130 Mo. App. 566, 109 S. W. 60.] Nor can we say the restrictions are not of substantial value to the appellants and the other lot owners in Flora Place, though there was much opinion evidence to the contrary from respondents' witnesses. Without doubt they are very valuable as against some kinds of trade, manufacturing and business structures and enterprises that otherwise might come in. That being so, respondents' contention simply amounts to this—that they ought to be permitted to build a church because it is a *church*, and not because changed conditions have made the covenants valueless to home owners. The argument that a church is harmless, wholesome of influence and high of purpose is appealing, but would be just as good if there had been no change in conditions along Grand Avenue. The parties convenanted against such structures and usage, and to erect and maintain one would violate the restrictions as the Hisey case, last cited, holds.

.

Furthermore, even the erection and maintenance of a church on Lot 1 would have a tendency to invade the quiet and seclusion of the restricted neighborhood, and would be attended with some confusion of foot and vehicular traffic. And might not the relaxation of the restrictions and the building of that edifice soon be claimed to justify the erection of an apartment house (as one witness proposed) at the northwest corner of the same intersection; and might not that, in turn, open up the way for encroachment still further into the district—if respondents' theory of the law is correct. At least it can be said these considerations would make the consequential damages difficult of estimation, which of itself justifies equitable intervention. [St. L. Safe Dep. & Sav. Bank v. Kennett, Est., 101 Mo. App. 370, 389, 74 S. W. 474, 480.]

VI. In our opinion the facts entitle appellants to injunctive relief, but not the full measure of relief prayed in their petition. We have held the restrictions cover only Lot 1; they do not cover lot two (2) and the north twenty-five (25) feet of lot three (3). The present Nicolaus dwelling house is nearly all on the latter lots. The plats and photographs in evidence indicate the small part on Lot 1 is not adapted to separate use in a manner conforming to the restrictions. This residence was built before the restrictive agreement was executed, and the covenants thereof are directed mainly at buildings thereafter to be erected and used. While restrictive covenants will be enforced, they are not favored in law and where there is any substantial lack of clearness the doubt will be resolved in favor of the free use of the property. [Bolin v. Tyrol Inv. Co., 273 Mo. 257, 200 S. W. 1059, L. R. A. 1918C 869.]

The cause is accordingly reversed and remanded with directions to the Circuit Court of the City of St. Louis to enter its decree granting to the appellants-plaintiffs an injunction against the respondents-defendants in accordance with the prayer of the plaintiffs' petition; but covering only said Lot one (1) in block four (4) of Tyler Place and in block twenty-one hundred eighteen (2118) of the city of St. Louis, said injunction to go against the erection and use of any new building or the remodelling and use of the present building in violation of the restrictions, but not against the use of the present Nicolaus dwelling house for purposes other than a strictly private residence. *Ferguson, C.,* concurs.

PER CURIAM:—The foregoing opinion by ELLISON, C., is adopted as the opinion of the court. All of the judges concur.