## MARCH, 1938.

Jesse L. Porter et al. Appellants, v. Carl R. Johnson et al., Respondents.—115 S. W. (2d) 529.

Kansas City Court of Appeals. March 7, 1938.

1152

*Bowersock, Fizzell & Rhodes* for appellants.

*L. Amasa Knox, Chas. H. Calloway* and *Carl R. Johnson pro se* for respondents.

SPERRY, J.—This is an action brought by plaintiffs below, who will be known here as plaintiffs, against Carl R. Johnson and Carrie Johnson, as defendants. The latter will be referred to in this opinion as defendants. Plaintiffs are the owners of certain tracts of land, particularly described in the petition, same being a part of the land described in a restrictive agreement hereinafter set out in full.

The owner of one parcel of the land mentioned in the restrictive agreement, and a signer of same, on October 7, 1935, sold and delivered possession of said property, same being located at 2602 Tracy, and described as:

The North 2⅔ feet of the East 117.5 feet of lot 21, and the South 30⅔ feet of the East 117.5 feet of lot 22, all in block 6, Porter Park, an addition to Kansas City, Jackson County, Mlissouri, to defendants, Carl R. and Carrie Johnson, persons of the Negro race. This sale to negroes was in violation of the restrictions. They entered into immediate possession and now occupy and claim title to said property. This they did with full knowledge of the restrictive

agreement. Plaintiffs prayed for relief by mandatory injunction, requiring defendants to vacate said property, and that their deed thereto be cancelled. Before conclusion of the trial two of the plaintiffs withdrew from the case as parties plaintiff, leaving these appealing plaintiffs. The case was tried in equity and the trial court refused plaintiffs the relief prayed for, or any relief, and entered judgment for defendants. From this judgment the remaining plaintiffs prosecute this appeal. The restrictive agreement above mentioned was pleaded and was in evidence. It is, in words and figures, as follows:

### Agreement.

The undersigned owners of land improved and unimproved described as follows:

The North 25 feet of Lot 14, all of Lots Fifteen (15), Sixteen (16), Seventeen (17), Eighteen (18), Nineteen (19), and Twenty (20), the South Fourteen (14) feet of Lot Twenty-one (21), and the East One hundred seventeen and one-half feet (117.5) of the North thirty-six feet (36) of Lot Twenty-one (21), and the East one hundred seventeen and one-half (117.5) feet of Lot Twenty-two (22), Block Six (6), Porter Park, an addition in Kansas City, Missouri, in Kansas City, Jackson County, Missouri and of various interests in said property hereby agree with each other and mutually bind themselves their respective heirs, successors and assigns the agreement of each being made in consideration of the agreement of each other to keep and observe the following restrictions with regard to the respective ownership use and disposition of said property.

1. No part of said property at said time shall be owned, occupied or used by or permitted or suffered to be owned, occupied or used by any person or persons of the Negro race or descent.

2. No part of said property shall be by any or either of the parties hereto their respective heirs and assigns or by anyone in their name or behalf conveyed, deeded, leased, willed, sold, rented or in anywise transferred to any person or persons of the Negro race or descent.

3. These restrictions shall remain in full force and effect for fifteen years from the date hereof and at the end of said period shall become automatically renewed and extended for an additional period of fifteen years, unless the persons owning a majority of the front feet abutting on the streets above described shall execute and acknowledge and cause to be recorded an instrument evidencing their election and intention that said restrictions shall not remain in force after said original period of fifteen years.

It is further agreed that the foregoing restrictions shall be inserted in all deeds, leases, deeds of trust and other conveyances and trans-

fers of any part of said property hereafter made by any party hereto, his heirs and assigns.

The restrictions herein set forth shall run with the land and bind the present owners their respective heirs, successors and assigns and all parties claiming by, through or under them and whether said restrictions be expressed in deeds thereof or not shall be taken to hold, agree and covenant with the owners of said lots their heirs, successors and assigns and with each of them to comply with and observe said restrictions, but no restriction herein set forth shall be personally binding on any corporation, person or persons except in respect to breaches committed during its, his or their seizen of or title to said land and the owner or owners of any of the above land shall have the right to sue for and obtain an injunction prohibitive or mandatory to prevent the breach of or to enforce the observance of the restrictions above set forth in addition to ordinary legal actions for damages or other relief at law or in equity and failure by the owner or owners of any of the lands above restricted to enforce any of the restrictions herein set forth at the time of its violation shall in no event be deemed a waiver of the right to do so thereafter.''

The instrument was duly filed for record, and was recorded in the office of the Recorder of Deeds within and for Jackson County, Missouri, May 19, 1921.

Defendants' contention is that the restrictive agreement is not enforceable. Such a contract is one which the parties entering into it had a right to make; and it is not void because of public policy. [Koehler v. Rowland (Mo. Sup.), 205 S. W. 217, l. c. 220.] It is, therefore, valid and binding. [Stevens v. Annex Realty Co., 173 Mo. 511.] Restrictive agreements affecting real estate create an easement in favor of the owner of one parcel of land within the restricted district in and to all other parcels located therein. This easement is a property right which may not be taken away against the will of the owner, by reason of constitutional provisions, for private purposes, either with or without just compensation; and it can only be taken for public purposes by condemnation, under the power of eminent domain, after payment of just compensation. [State ex rel. Britton v. Mulloy, 332 Mo. 1107, l. c. 1111, 1112.] Such property right, created by contract, will be protected by injunction where the issues are between parties to the contract. [State ex rel. Britton v. Mulloy, *supra*, l. c. 1112.] The fact that the restrictive agreement was not contained in deeds of a common grantor but rests on contract as between the then owners of the various parcels covered, does not affect the right of any signer, or his grantees, to sue for enforcement of the covenant. This is true even though there be no provision in the restrictive agreement for re-entry or forfeiture. [Rombauer v. Compton Heights Christian Church, 328 Mo. 1.] In a case such as the one at bar the covenantee may stand upon his contract and the law will enforce it, irrespec-

tive of the amount of monetary damage involved. [Rombauer v. Compton Heights Christian Church, *supra*, l. c. 17.] Title to real estate is not involved in this kind of action. [Rombauer v. Compton Heights Christian Church, *supra*.] Hence, courts of appeal have jurisdiction. [Compton Hill Improvement Co. v. Strauch, 162 Mo. App. 76; Noel v. Hill, 158 Mo. App. 426.]

It is urged that there has been a complete abandonment of the restrictive agreement. None of the parties prosecuting this appeal have abandoned. Abandonment of a written contract may be either by formal release or by conduct of the parties. [Creamery Package Mfg. Co. v. Sharples Company, 71 S. W. 1068.] But one party to a contract may not deprive another of its benefits simply because of his own conduct, or even by executing a written release, unless the party seeking to enforce it has himself abandoned it, or acquiesced in the conduct of the other. Otherwise a contract would be binding only so long as all parties thereto consented; and if that be the law, then all contracts become of less value than the value of the services of the lawyers in preparing them. There is nothing in this contract to prevent *all* of the owners from abandoning it at any time; and a majority could have bound all if they had acted at the time and in the manner stated in the contract. [Noel v. Hill, 158 Mo. App. 426, l. c. 443.]

The contract under consideration was, *in effect*, made for a period of thirty years from its date; but it provided a method whereby it might be terminated at the end of fifteen years. If that method was not followed it is still binding on all the parties and their grantees. The method for abandonment, as provided therein, was as follows: The owners of a majority of the front feet of the property within the district facing on Tracy Avenue might sign, execute, and file for record a formal abandonment of the restrictive agreement, provided same was done prior to the expiration of the first fifteen year period; and in that event the restrictive agreement should cease to be operative from and after May 1, 1936. Such a formal contract of abandonment was filed by some of the lot owners; but there was no evidence offered, or claim made, that the signers thereof own a majority of the front feet of the lots embraced within the district. Abandonment is an affirmative defense which respondents were required to establish. The record being as it is we must hold that the above mentioned instrument fails to meet the requirements of formal abandonment, as they are above set out. The contract, then, became automatically effective, or continued in effect, for the second period provided therein. It is binding on every lot owner in the district because the instrument was signed by all of the then owners. If plaintiffs had abandoned the restrictions, either formally or by their conduct, they might not be permitted to enforce as to others, especially in equity. But here no such condition is shown. The rights of these plaintiffs cannot

be affected by the conduct of others, for whose conduct they are in no wise responsible, and in whose acts and conduct they did not acquiesce.

Some of the plaintiffs below, other than these appellants, withdrew as plaintiffs. They may have had several reasons for so doing, as, for instance, because they did not want to be liable for court costs, or for attorney fees, or because of other reasons. But no matter what actuated them in withdrawing as parties plaintiff, such action could not and did not affect the property rights of these plaintiffs. They cannot be divested of their property because of what some one else similarily situated may have done or failed to do.

The same may be said regarding evidence to the effect that some of the original plaintiffs had, on some prior occasion, stated that they had no objection to abandonment of the restrictions; that they had no objection to negroes purchasing and occupying lots within the area restricted; or that they offered their lots for sale to negroes. These plaintiffs have done none of those things. Their property rights will be adjudicated in the light of the contract, and of their own conduct, unaffected by any attitude, statements or acts of others over whom they have no control. It is not even claimed that these plaintiffs acquiesced in such conduct by other property owners within the district. Because one person gives away his property it will not be said that his neighbor has also given his away.

Plaintiffs are not barred from relief by reason of their acquiescence in violation of conditions in the restrictive agreement because they never acquiesced therein. Defendants are the first negroes to purchase and occupy property covered by the restrictive agreement. Therefore this is the first actual violation. This action was brought with reasonable promptitude thereafter.

It is suggested that the restrictive agreement should be strictly construed in favor of freeing the property. The rules governing construction of restrictive agreements are the same general rules to be followed in construing any contract or covenant. [Strauss v. Nichols Land Company, 327 Mo. 205, 1. c. 213.] The prime rule of construction is that when there is no ambiguity in the language used, then there is no room for construction. The plain every day meaning of the language of the contract governs. That is this case. Defendants do not claim any ambiguity, but they urge that enforcement of the covenant will work a hardship on 50,000 negroes in Kansas City because they are said to be having difficulty in finding homes. We cannot agree that the property of any person may be confiscated for private purposes simply because some one, regardless of race or color, fancies a particular house, and covets it and no other. The social and economic rights of every citizen are guaranteed by the constitution of the United States; but such rights are not infringed by restrictive covenants such as the one at bar. [Koehler v. Rowland, 275 Mo. 573.] The property rights of every citizen, black or

white, are equally under the protection of the constitution. Defendants' position, if sustained on the ground urged, would result in overriding the very constitutional and statutory provisions upon which the Negro race places chief reliance for safety and security. To establish a precedent on the excuse offered would be to start a boomerang on its vicious circuit. Such a weapon, it is said, invariably returns to its starting point.

We come, finally, to the only contention of defendants that has any real merit. It is urged that the conditions which induced the execution of the agreement have so materially changed as to render it inequitable to enforce it. ''The general rule is that equity will enjoin the violation of restrictive covenants irrespective of the amount of damage which would result from a breach and even though there be no substantial monetary damage. The covenantee may stand upon his contract and the law will enforce it. . '. .

''When, however, the restrictive agreement is induced by the then existing condition and surroundings of the realty in the covenanted area, and assumes its continued availability for particular uses, if a radical change takes place in the whole neighborhood such as defeats the purpose of the restrictions and renders their enforcement inequitable and oppressive, equity will not enforce them, but will leave the complainant to his remedy at law. [32 C. J., sec. 328, p. 212; 14 R. C. L., sec. 100, p. 399; Koehler v. Rowland, 275 Mo. 573, 587, 205 S. W. 212, 221, 9 A. L. R. 107.] This is not on the theory that the contract, as such fails to cover the situation . . .; but it is because the changed condition forbid equitable intervention.'' [Rombauer v. Christian Church, *supra*, l. c. 17.]

The evidence here is that at the time the covenant was entered into, negroes had completely taken over the residence property on Tracy Avenue up to a point two blocks North of the North side of the area restricted; but only white people then lived along this street from that point South, to, including, and beyond this district. The evidence also discloses that negroes have since taken over all of the property along Tracy, Northward from the North line of this district; that one house on the North side of the block out of which the district is carved, was bought by a negro just prior to the adoption of the covenant; that this negro still resides there; that his advent in the block occasioned the execution of the covenant; that the South lot in this district is vacant and is not within the restricted district; that the property across the street from the district is vacant, unrestricted and is advertised for sale to negroes for residential property; that at the time the agreement was signed this last mentioned property was restricted, as was also the block North of this area; that negroes occupy the properties back of this area, as well as that back of the vacant lot across the street; that the trend of Negro migration in Kansas City is Southward in this neighborhood, along Tracy Avenue;

that only eighteen new residences for Negro occupancy have been built in Kansas City during the past fifteen years, and that the Negro population is increasing and negroes have, for many years, been moving Southward in this general neighborhood, gradually abandoning residences formerly occupied by them to the North, for the reason that owners could not afford to keep property occupied by them in repair on the rental received. The above facts are admitted by both sides in oral argument. There seems to be no doubt but that conditions in the surrounding neighborhood, on three sides, outside of the restricted district, have changed materially with reference to Negro occupancy since the restrictive agreement was made and entered into.

However, it would seem that the property owners, in 1921, anticipated these very changes in the surrounding neighborhood, and believed that unless they protected themselves against it the block would be invaded by colored residents. They acted to enforce the covenant promptly after the first negro moved into the block. They adopted these restrictions, so far as this record shows, independently of the action of residents of other similar areas that adopted restriction at about that same time. In other words, the residents of this area did not join with owners of other property in this general neighborhood in adopting restrictions. We cannot say that they would not have so restricted their district had they fully anticipated that every house in the neighborhood, outside of this particular district, would eventually be occupied by negroes. It would seem that a majority would have so acted in the face of that certain knowledge, because, even in 1936, before the first fifteen year period had expired, according to the record, the owners of a majority of the frontage in the district failed to sign the formal release, although such a release was being circulated.

"If no radical change in the condition and use of the restricted property occurs, the circumstances that there have been changes in the territory *surrounding* the covenanted area will not of itself be sufficient to destroy the restrictions. [Pierce v. St. Louis Union Trust Company, *supra*, 311 Mo. l. c. 295, et seq., 278 S. W. l. c. 408.]'' [Rombauer v. Christian Church, 328 Mo. l. c. 18.] The fact that changed conditions render the restriction less valuable will not prevent their enforcement if the restrictions remain of substantial value. [Rombauer v. Christian Church, *supra*.] Nor will courts refuse to enforce restrictions even if the property be of more monetary value with restrictions removed. There are some rights more valuable than money. [Noel v. Hill, 158 Mo. App. 426, l. c. 450.] We do not agree with the contention of defendants that since negroes live on property abutting this area on the rear, and live one-half block in front, facing another street, and that since vacant property across the street is offered for sale to negroes for residential purposes, the

restrictions are without value to plaintiffs. The vacant property across the street is not likely to be built up with negro tenanted houses for many years to come, in view of the record of such building during the past fifteen years. The same may be said of speculation as to future building on and occupancy of the corner lot adjoining the district on the South, it now being vacant. The one negro occupied house on the North was so occupied before the area was restricted, consequently it's occupancy has not changed conditions at all.

In the Rombauer case, *supra,* the Supreme Court said that the defense of changed conditions is an affirmative defense, and that he who asserts it must prove three things, to-wit: ''(1) the radical change in condition; (2) that as a result enforcement of the restrictions will work undue hardship on him; (3) and will be of no substantial benefit to the plaintiff.'' Argument as to whether or not negroes may occupy property outside the district at some speculative future date does not tend to prove a present changed condition; nor does speculation as to what may occur in the next block South of the area and outside of it, prove, or tend to prove, the ultimate facts. This case is not similar to one involving restrictions against business encroachment where the district thereafter becomes surrounded with industrial buildings on the outside, the smoke and fumes of which render the district wholly undesirable from a residential standpoint. Such a changed condition as that gives reason for an exception to the rule declared in Pierce v. St. Louis Union Trust Company, *supra*; but such is not this case. The evidence here fails to establish that conditions have so changed as to render the restrictions of no substantial value to plaintiffs.

Where the rights of parties seeking injunctive relief are based not on the *general* law, but rather, on *contractual* agreements, as in this case, injunctive relief will be granted as a matter of right if the contract relied on was made complete, fair, and untainted with fraud (as this was, so far as the evidence here presented shows). The field of judicial dicretion, in such case is much more narrow when the equitable relief prayed is bottomed on private contract, because ''certain it is the law will not permit a man to repudiate his solemn restrictive covenants, fairly entered into, merely because changed conditions render it more inconvenient for him to perform than for his adversary to suffer a breach. If the performance of contracts depended on the convenience of the parties there would be little need of having them.'' [Rombauer v. Christian Church, *supra,* l. c. 21.]

We think plaintiffs are entitled to stand on their contract and have it enforced at equity. Their remedy at law, under the circumstances of this case, would be wholly inadequate. To deny them equitable relief would be to permit the violation of the restrictive agreement and permit property adjoining theirs to be occupied by persons of

the Negro race, and, in the case of the former owner of the property now owned by defendants, compel plaintiffs to go outside of this jurisdiction to recover damages from her. The evidence is that defendants paid only $50 down on the property when they bought it, and since then they have paid an amount, monthly, equivalent only to about a fair rental. There is no evidence as to who owns the mortgage outstanding against the property. To say plaintiffs can be compensated by money judgment would be to give them stones when they ask for bread, even if we assume that their rights are capable of monetary ascertainment, which we do not.

Defendants cannot complain of the harshness of the rule, if it seems harsh, because they bought with full knowledge, actual as well as constructive, of the restrictions. They admit in evidence that they took a chance on being able to break the covenant. They will be required to abide by their decision. We join with the St. Louis Court of Appeals in its policy as announced in Noel v. Hill, *supra*. The foundation stone of a happy, contented and satisfied people is the home. The building of homes is to be encouraged because of the spiritual contentment a home brings to man. A home owner become a solid citizen with a stake in the community and is a supporter and defender of his government. It is the ambition of men and women to have homes in which to seek refuge and peace, and in which to rear families. They are not built or acquired with a view to their monetary value, but, rather, because of their spiritual appeal. Most homes cost the home owners more in dollars and cents than he ever hopes to receive for it; but he receives the monetary difference in "living." People who own a home, or contemplate acquiring one, have a right to protect it against future encroachments of business or other elements distasteful to them. Negroes have the same right in this respect as do those of other races. Home owners and prospective home owners should have confidence in the power and the willingness of the courts to protect their investment in happiness and security. Their solemn undertakings with this object in view will not be lightly set aside by this court, but will be zealously guarded as a gesture of encouragement to our people to become home owners instead of tenants.

This court has power, through its mandatory injunction, to compel the undoing of a thing already done in violation of restrictive agreements affecting real estate. The St. Louis Court of Appeals sustained the judgment of the circuit court ordering removal of a porch already built in violation of such an agreement. Compton Hill Improvement Company v. Strauch, *supra*, l. c. 86; and the Supreme Court enjoined the continued use and occupancy of a public school building already completed at a cost of $170,000. [State ex rel. Britton v. Mulloy, 332 Mo. 1107; Britton v. School District, 328 Mo. 1185; 44 S. W. (2d) 33.] We can grant a part of the relief prayed

for and withhold a part. [Rombaue v. Christian Church, *supra, l. c.* 22.]

The judgment of the circuit court is, accordingly, reversed, and the cause remanded, with directions that the circuit court set aside its former judgment and decree in this case, and enter judgment in favor of plaintiffs as against defendants, enjoining their continued occupancy of the property described in this opinion until May 1, 1951; enjoining them from leasing, selling, or delivering possession of it to persons of the Negro race until on and after May 1, 1951; and ordering, and directing defendants to vacate said property forthwith; and adjudging that defendants pay all costs of this action. *Campbell, C.,* concurs.

PER CURIAM:—The foregoing opinion of SPERRY, C., is adopted as the opinion of the court. The judgment is reversed and the cause remanded with directions to the circuit court to enter judgment in favor of plaintiffs and against defendants; to enjoin defendants from the continued occupancy of the property described in the opinion; enjoining defendants from selling, leasing, or delivering possession of it to persons of the Negro race until on and after May 1, 1951; directing defendants to vacate said property forthwith; and adjudging that defendants pay all costs of this action. All concur.